**Alex GONZALES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–90–00582–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Sept. 15, 1992.

Rehearing Denied Oct. 29, 1992.

**850**

George McCall Secrest, Jr., Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, Chuck Rosenthal, Donald A. Smyth, Asst. Dist. Attys., for appellee.

Before OLIVER–PARROTT, C.J., and O'CONNOR and COHEN, JJ.

## OPINION

COHEN, Justice.

In the early morning hours of October 31, 1989, appellant shot and killed Ida Delaney. The shooting ended an encounter that began near the Park Place entrance ramp to the Gulf Freeway and covered 12 miles as appellant and his two companions, all off-duty Houston police officers, pursued Delaney's pickup truck across Houston to the Newcastle exit of the Southwest Freeway. There, after a face-to-face confrontation in which Delaney wounded appellant with gunfire from her revolver, appellant shot her to death.

Appellant was indicted for murder. A jury found him guilty of voluntary manslaughter and assessed punishment at seven years in prison. Because appellant was not allowed to present admissible evidence that was vital to his defense and because the jury charge commented on the weight of the evidence, which is prohibited by Texas law, we reverse the judgment and remand the cause for a new trial.

On the night of October 30, appellant attended a birthday party for his police partner at Tequila's, a restaurant and bar, arriving about 10:00 p.m. While there, he ate a meal and consumed two bottles of beer, three or four cups of draft beer, and two or three mixed drinks. At about 1:00 a.m. on October 31, appellant and two other police officers, Alex Romero and Robert Gonzales,[1] left Tequila's, destined for the High Ten Cabaret, a "gentlemen's club." At that time, Romero had consumed four or five beers and Gonzales had had five or six.

While at the High Ten Cabaret, Romero had another beer, Gonzales also had one or two beers, and appellant had three mixed drinks. When the cabaret closed at 2:00 a.m., the three returned to Tequila's. Once there, they shot pool for a time, during which they had free access to the bar. Romero had another beer, and appellant had another drink. However, the men testified they were not intoxicated. Appellant testified that, at all relevant times, he had "absolutely full use of [his] mental and physical facilities." Around 4:45 a.m., the three men left Tequila's to get food. They traveled in appellant's car, a Mercury Cougar. Romero drove.

Ida Delaney left Galveston about 4:15 a.m. on October 31, 1989 to go to her job at the Houston Post building. She came upon the car carrying the three men near the Park Place entrance ramp on the Gulf Freeway.

As the three men were entering the Gulf Freeway going north, Delaney's pickup truck swerved into their lane. Romero had

---

1. As used in this opinion, "Gonzales" refers to Robert Gonzales. The appellant, Alex Gonzales, will be referred to as "appellant."

to swerve and brake to avoid being hit. When he returned to the lane with the pickup truck ahead of him, he flashed his headlights from dim to bright and blew the horn. All three men testified that within seconds the driver in the truck stuck his or her hand out of the window and fired a gun at them. At the time, the men did not know the number, race, or gender of the truck's occupants. Romero stated:

"Well, within seconds the person in the truck just shot at us with a pistol ... at the time the pickup swerved into my lane and after I broke and swerved, and after I ... flashed the high lights and blew the horn. I saw a person stick out their hand and just point the revolver at us and shoot one time. You could see—you could hear the gunshot and you could see the fire from the barrel."

Romero testified the driver displayed the gun at them a second time, near the Scott Street exit, and he decided to follow the truck, hoping to find a police patrol car to stop the truck. Unknown to the men, the automatic dimmer on appellant's car was broken and the lights continued flashing from high to low beam on their own after this initial encounter. Romero testified that he did not intend to continue flashing the lights of the car and did not realize they were flashing. Romero testified he stayed three car lengths behind the truck at all times.

Dennis Finn, a concrete pumper, was travelling inbound on the Gulf Freeway going to work. Near the Woodridge exit, he noticed the pickup truck and the car. The car was tailgating the truck and was flashing its lights from bright to dim. Each time the pickup changed lanes, the car followed. Neither vehicle was driving recklessly or speeding. Finn concluded the car was attempting to get the truck to pull over, but he did not think it was trying to force the pickup off the road.

Ysidro Villarreal saw the pickup and car on the Southwest Freeway between the Hazard Street overpass and Loop 610. The car was travelling behind the truck, blinking its lights. Villareal thought the car was trying to run the pickup off the road or ram it from behind. The vehicles were not speeding; the pickup maintained its speed and stayed in the right hand lane. Near the Summit and the Weslayan exit, the two vehicles slowed to 20 or 25 miles per hour. Villarreal could see that the driver of the pickup was a woman. She was leaning forward slightly and driving with both hands on the steering wheel. To Villarreal, she looked "petrified."

Pablo Garcia and his partner, Jim Dunn, were Texas Highway Department employees assigned to the Courtesy Patrol on the morning of October 31, 1989. Shortly before 5:00 a.m., while travelling outbound on the Southwest Freeway near the Newcastle exit, they hit a pothole. They decided to measure it and stopped their vehicle on the freeway's inside shoulder, activating their red, blue, and yellow overhead emergency lights. As they were preparing to leave, Dunn called Garcia's attention to two vehicles approaching. The car was in the far right hand lane and the truck was in the second lane from the right. He thought the truck was trying to exit at Newcastle, but the car wouldn't let it. It looked like the vehicles "were fixing to hit one another...." Then the pickup left its lane and slowly drove diagonally across the freeway to the inside shoulder in front of Garcia's courtesy vehicle.

The pickup stopped and backed up toward the courtesy vehicle. Then the driver got out and started walking toward them "in a casual manner." She had nothing in her hands. As she reached the rear of her truck, appellant's car pulled up. The woman directed all her attention toward it, turned around, and got back in her truck. Two men got out of the car and ran up to Garcia's courtesy vehicle, saying they were police officers and the truck driver had been shooting at them earlier. They seemed scared and excited. One man had some kind of identification, but Garcia could not read it. Garcia did not believe they were police officers, and he was afraid of them. A third man, appellant, ran toward the woman holding a gun with both his hands, "coming right in front of her face." He did not see appellant display

identification to the woman, although he heard appellant screaming the whole time that he was "a cop," "freeze," and "don't move." He never heard appellant tell the woman she was under arrest.

The woman tried to close the driver's door of the truck, but appellant got between her and the door and would not let her close it. Garcia saw appellant hit the woman in the face with his left fist, like one would hit another man. After being struck, the woman fell back in the seat and turned to her right, then back to her left. Then she got out of the truck. Someone yelled that she had a gun. As she left the truck, she shot appellant in the chest. Garcia thought she fired two or three times. Appellant returned the fire with his automatic pistol, firing "a whole bunch of shots." Appellant emptied his weapon, hitting Delaney four times.

Romero testified that when appellant approached the truck, appellant had his wallet in one hand and his gun in the other. Romero went around the passenger side of the truck and could not see appellant just before the shooting. He heard the shots and saw Delaney fall. Then appellant said that he had been shot and collapsed.

Appellant testified he was authorized to act as a police officer 24 hours a day; that a felony and a breach of the peace occurred when Delaney fired at his car; and that he had no choice but to follow the truck until they could have a marked police car stop it and apprehend the suspects. When the vehicles stopped, appellant ran to the trunk of his car to get his pistol. He described his emotional state then as being "excited," his emotions were "real high," and he was "scared, afraid of the confrontation." As he approached the truck, he had his wallet in one hand and his gun in the other and was yelling that they were "cops," the suspect was "under arrest," "freeze," and "don't move." Then, continuing to approach the truck on the driver's side, he put his wallet away.

He saw the driver's door open, but the driver did not leave the truck. Then, he saw the driver lean to the right and pick up something from the front seat. He thought it was a gun. He tried to grab the driver with his left hand, but she bit him. When he pulled back, she shot him in the chest. Appellant testified that when he was shot, he was "hurt" and "stunned." As he fell, he saw the driver get out of the truck, still pointing her gun at him. He stated, "That's when we both fired again." Appellant thought he had been shot four times. He was actually hit once.

Appellant was taken by Life Flight helicopter to a hospital, arriving at 5:48 a.m. Shortly after his arrival, his blood sample showed a .19% blood alcohol level.

In addition, the jury heard the following evidence: Valry Lewis, Delaney's boyfriend, testified that Delaney lived in Texas City. He and Delaney had spent Monday night, October 30, in Galveston. Delaney was in a good mood when she left Galveston for work early Tuesday morning. Delaney bought the gun she used to shoot appellant several weeks before. As far as he knew, she kept only five bullets with her. The defense introduced photographic evidence of additional ammunition on the floor of the truck.

Ed Porter, an assistant district attorney, testified that he went to the scene at about 6:30 a.m. on the morning of the shootings. He videotaped the route taken by the car and truck and determined it to be approximately 12 miles long. At 55 mph, it took 13–14 minutes to travel that distance. Porter stated that the fact that one travels from county to county is an affirmative defense to the charge of carrying a weapon.

Several Life Flight and hospital employees testified that appellant did not seem intoxicated when they saw him at the hospital. Medical personnel and other witnesses testified that it is not unusual for trauma to mask signs of intoxication.

Steven Clappart, a homicide detective with the Houston Police Department, testified about police procedure and H.P.D. policy. He explained that a police officer cannot be intoxicated while on duty, and police officers are discouraged from appearing in public while intoxicated. Plain-clothed officers are discouraged from making arrests

without having uniformed officers available. If an officer in plain clothes does decide to make an arrest, the officer should show his or her ID or pin his or her badge to the breast pocket, on the left side of his jacket or shirt in plain view. Pursuit of a suspect by an officer in an unmarked vehicle is discouraged. On cross-examination, Clappert agreed that the fact that an action is discouraged does not mean it is prohibited. Such decisions are discretionary with the officers.

Peter Christian, laboratory administrator for H.P.D., testified that the blood alcohol level on the two tubes of blood extracted at different times from appellant were .19 and .11, respectively. A person with a .19 level is intoxicated. He agreed that adrenalin can override some of the effects of alcohol. Christian also testified that ballistics tests showed Delaney was shot twice from six to 10 inches away. A third shot came from about 15 to 20 inches away. Appellant's clothing indicated that the gun that wounded him was in contact with the garment when it was fired.

Charles Anderson, H.P.D. firearms examiner, testified he found eight spent cartridges from a .45 caliber pistol at the shooting scene. Appellant's .45 automatic holds eight cartridges. Anderson stated that the average police officer using a weapon like appellant's could fire eight shots in less than two seconds. Anderson also testified that he found a five shot, .38 caliber revolver in Delaney's hand. Five fired cartridges were found inside the gun. Finally, Anderson stated that when he arrived at the scene, he found the driver's window of the pickup more than half way down.

## VOLUNTARY MANSLAUGHTER: THE LESSER INCLUDED OFFENSE

■ In his first two points of error, appellant contends the evidence was insufficient to support submission of a jury instruction on voluntary manslaughter and to support his conviction for that offense.

One commits voluntary manslaughter:

(a) [I]f he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) "Sudden passion" means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) "Adequate cause" means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

TEX.PENAL CODE ANN. § 19.04(a), (b), (c) (Vernon 1989). "Sudden passion" has been described as an excited and agitated state of mind at the time of the killing caused by direct provocation by the victim. *Hobson v. State,* 644 S.W.2d 473, 478 n. 10 (Tex. Crim.App.1983); *Merchant v. State,* 810 S.W.2d 305, 309 (Tex.App.—Dallas 1991, pet. ref'd); *Brunson v. State,* 764 S.W.2d 888, 894 (Tex.App.—Austin 1989, pet. ref'd).

The State requested the charge on voluntary manslaughter in this case. Appellant objected. He contends the evidence in this murder trial did not raise the *sometime* lesser included offense of voluntary manslaughter. *Bradley v. State,* 688 S.W.2d 847, 851 (Tex.Crim.App.1985).

■ An instruction on a lesser included offense is proper if: (1) proof of the charged offense includes proof of the lesser included offense; and (2) some evidence shows the defendant is guilty only of the lesser included offense. *Havard v. State,* 800 S.W.2d 195, 215–16 (Tex.Crim.App. 1989) (op. on reh'g); *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex.Crim.App.1985).

■ Voluntary manslaughter is not always a lesser included offense of murder. In a murder prosecution, there must be some evidence of sudden passion before voluntary manslaughter is a lesser included offense. *Bradley,* 688 S.W.2d at 851. If

requested, the trial court must submit the charge on voluntary manslaughter if there is evidence showing (1) legally adequate cause that would produce anger, rage, resentment, or terror sufficient to make an ordinary person incapable of cool reflection; and (2) the accused's excited and agitated state of mind that could have arisen out of provocation by the victim at the time of the killing. *Merchant,* 810 S.W.2d at 310; *Brunson,* 764 S.W.2d at 894. Appellant does not challenge the evidence of adequate cause. The issue before us, then, is whether there was sufficient evidence that appellant acted under the influence of sudden passion in shooting Ida Delaney.

These principles guide our analysis:

The credibility of the evidence and whether it is controverted or conflicts with other evidence in the case may not be considered in determining whether a defensive charge or an instruction on a lesser included offense should be given. When evidence from any source raises an issue that a lesser included offense may have been committed and a jury charge on the issue is properly requested, the issue must be submitted to the jury. It is then the jury's duty, under the proper instructions, to determine whether the evidence is credible and supports the defense or the lesser included offense.

*Moore v. State,* 574 S.W.2d 122, 124 (Tex. Crim.App. [Panel Op.] 1978); *Brunson,* 764 S.W.2d at 893.

■ In deciding whether sudden passion has been raised, we inquire whether there is any evidence, however weak, contested, or incredible, that could support a rational jury finding that the accused acted under the immediate influence of sudden passion arising from an adequate cause. *Gold v. State,* 736 S.W.2d 685, 688 (Tex.Crim.App. 1987); *Brunson,* 764 S.W.2d at 893. Implicit in the *Gold* holding is the restriction that the evidence may not be so weak, contested, or incredible that it could not support such a finding by a rational jury. In other words, it is not the volume of evidence that controls, but the quality.

Appellant contends his testimony did not raise the issue of sudden passion. He testi-fied that he shot Delaney in self-defense and in defense of others. "I was shot, I was scared, I thought I was going to die, I was in fear of my life, and she was going to shoot me again.... I had to protect myself and everybody else that was around there. We didn't know who was in that vehicle." Appellant also asserts the evidence established he had "absolutely full use of his mental and physical facilities when all this happened."

■ The State asserts appellant's testimony raised the issue of sudden passion. The testimony of the accused alone can raise the lesser included offense of voluntary manslaughter. *Brunson,* 764 S.W.2d at 893. As proof of "sudden passion," the State relies on appellant's testimony that when shot, he was "excited, scared, hurt, and stunned." Moreover, the State correctly points out that appellant's testimony that he was in control of all his mental faculties was presented in the context of questioning about his alleged impairment due to intoxication, not about his thoughts or emotions at the moment he shot Delaney.

We need not decide whether appellant's testimony, standing alone, raised the issue of sudden passion because there is other evidence of sudden passion. *See Merchant,* 810 S.W.2d at 309 (the court is not restricted solely to whether the defendant's testimony raises or negates the issue of the lesser included offense). The other two officers, Gonzales and Romero, testified that all three men, including appellant, were in a heightened state of emotion immediately before the shooting. Garcia and Dunn, the two highway department workers, described the intense emotional states of the three when they arrived on the scene and confronted Delaney. In particular, Garcia stated that appellant's excited and unusual behavior caused them to doubt he was a police officer. Evidence regarding appellant's agitated emotional state immediately before the shooting is relevant to his state of mind at the time of the offense. *Havard,* 800 S.W.2d at 216 n. 4.

The State contends that being shot in the chest by another person at close range is

an event that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, *naturally* rendering him incapable of cool reflection. We agree that, under these circumstances, the jury could reasonably have concluded that appellant experienced great anger, rage, terror, and resentment when Delaney shot him. But the record shows more to support the conclusion of sudden passion than "just" being shot in the chest. After shooting appellant, Delaney was still in front of him, still holding a gun, still firing, still giving appellant good reason to believe, as appellant testified he did believe, that he was about to die. Appellant's erroneous belief that he had been shot four times further supports the conclusion that, during these events, he was incapable of cool reflection. Finally, appellant's act of emptying his gun, firing eight shots at Delaney at close range, could support the jury's conclusion that he was acting out of sudden passion rather than cool reflection. *See Havard*, 800 S.W.2d at 217 (defendant's hurt and enraged state of mind just before the shooting, coupled with his act of spraying the entire area with bullets in an instinctive reaction to perceived danger and the belief that someone had shot at him, was sufficient evidence that he was acting under the immediate influence of sudden passion); *Merchant*, 810 S.W.2d at 312. Because appellant was shot, not just shot at, this case is not controlled by *Gonzales v. State*, 717 S.W.2d 355 (Tex.Crim.App. 1986) (no evidence of sudden passion, even though the defendant had just seen the victim shoot at him).

Accordingly, we hold the evidence was sufficient to submit a charge on voluntary manslaughter and to support the judgment. *Merchant*, 810 S.W.2d at 309, 311–12; *Moore*, 574 S.W.2d at 124; *Brunson*, 764 S.W.2d at 893 (if evidence warrants submission of the lesser included offense, the jury's right to weigh and decide the evidence precludes reversal on grounds of insufficient evidence).

We overrule appellant's first two points of error.

## THE EXCLUDED EVIDENCE

In points of error 3 and 4, appellant complains the trial court erred by refusing to admit both opinion testimony of Delaney's bad reputation and evidence of three violent acts by Delaney, all of which supported appellant's claim of self-defense by showing that Delaney was the first aggressor.

The court refused to admit the following evidence:

1. Opinion testimony of H.P.D. Officer Kerckhoff and former H.P.D. Officer James that Delaney had a bad reputation for being a peaceful and law abiding citizen.

2. Testimony by Kerckhoff and James that Delaney assaulted them on April 10, 1971, causing her to be charged with and to plead guilty to the misdemeanor offense of aggravated assault on a police officer.

3. Testimony by Ida Delaney's former husband, James Delaney, that, in the late 1960's, she shot him, and on one occasion in the 1970's, she shot at him 3 times but missed.

4. Testimony of H.P.D. Sgt. Clappart that Ida Delaney was arrested, but not charged, in a 1959 incident in which a person was stabbed with an ice pick.

We hold that the trial court erred in excluding all of the stated evidence, except Sgt. Clappart's testimony, and that the error was harmful. Thus, we sustain points of error 3 and 4.

Appellant made a bill of exceptions consisting of Kerckhoff's and James' offense report, their complaint against Ida Delaney in the 1971 assault, and the judgment and sentence showing her guilty plea and fine for that offense. The offense report shows that shortly after midnight on April 10, 1971, James and Kerckhoff stopped a vehicle driven by Ida Delaney. It states:

Officers observed the above listed vehicle proceeding south on Jensen with [Ida Delaney] driving. Officers clocked the vehicle at 60 mph in a 30 mph zone from the 1700 block through the 1500 block of Jensen. The vehicle turned east on Lyons and Officers stopped the vehicle in

the 2500 block of Lyons. Officer James approached the above subj. and asked for driver's license and told the subjs. that she was stopped for doing 60 mph in a 30 mph. Subj. immediately began cursing the officers and shouting that "you white Mother F....s cops are all alike." and quickly got out of the car and went around to the trunk and opened it and when asked what she was doing she stated she was getting her driver's license. Subj. repeatedly stated that her car was private property and that the officers better not touch it. At this time Officer Kerckhoff observed that the passenger [James Delaney] was intoxicated and asked him to step from the car and produce identification. He at first refused but as officer opened the door he stepped out. When he saw that the trunk was open he walked to the trunk and began shouting that the officers had no right to be looking in his trunk. Officer placed him under arrest for drunk and as they were attempting to handcuff him, due to his belligerent attitude, the above subj., Ida ... Delaney, began shouting and cursing the officers and ran back to where the officers were standing and grabbed Officer James at which time he attempted to place her under arrest and she ran from the officers around the car and as Officer Kerckhoff stepped into her path she swung her fist, cutting Officer Kerckhoff below the eye, with either her ring or fingernails. As Officer James attempted to assist in making the arrest, subj. cut the officer on the right wrist with her fingernails. Subj. was subdued and together with James Russell Delaney, was brought to central station ... where Sgt. Woodruff authorized AAPO on the subj. Ida ... Delaney.... Ida ... Delaney was marked hold for homicide, and filed on ... for AAPO ...

Kerckhoff's affidavit commencing the assault case alleged that Ida Delaney assaulted him and Officer James "by hitting the said officers and scratching the said officers in the face...." The final judgment and sentence shows Ida Delaney pleaded guilty and was assessed a $200 fine. The trial judge refused to allow James or Kerckhoff to testify about these facts and also refused to let them testify that Ida Delaney's reputation as a peaceful and law-abiding citizen was bad.

The trial judge allowed some testimony from James Delaney and excluded other testimony from him. He testified before the jury that he was married to Ida Delaney for 12 years, from 1966 until their divorce in 1978; that she was a "violent lady," who had a "very high" temper, meaning a "quick temper" that would result in physical violence; that she carried a gun and an ice pick about her person and that, in his opinion, she was "violent, aggressive, and nonpeaceful." On cross-examination, the State showed that he and Ida Delaney had been adversaries in court after their divorce over the ownership of the home they resided in during marriage and over child support.

Appellant complains that the court erred by excluding the following evidence, summarized from James Delaney's testimony on a bill of exception:

On two separate occasions during their marriage, Ida Lee Delaney shot guns at James Delaney without justification, trying to kill him. The first time was in the late 1960's, when she shot him with a .22 pistol, striking him in the arm when he raised his arms for protection. He believed he would have been struck in the heart, otherwise. On that first occasion, Mr. Delaney was unarmed and was not striking either Ida Lee Delaney or any children. He testified Ida Delaney always carried a gun and that he had seen her carrying an ice pick in her purse. She would carry the gun in her bosom. She was quick tempered, violent when angry, made threats, and was not easily frightened. Mr. Delaney did not call police to report the first shooting. On one occasion that Mr. Delaney estimated to be in 1972, Ida Delaney fired a .38 caliber pistol at him three times. He reported this to police, who advised him that he or his wife would have to leave the house. No offense report was made, as far as he knows.

The final evidence that appellant claims should have been admitted was Sgt. Clappart's testimony. Clappart produced a 1959 Houston Police Department report pertaining to "Ida Lee Williams," who he testified was the same person as the complainant, Ida Delaney. Clappart did not witness the events contained in the report, and appellant offered no testimony from anyone who did. The report stated that Delaney was "involved in a stabbing incident in which an ice pick was used as the weapon." Evidence at trial showed that an ice pick was found in Delaney's purse the night she was killed, and that it was a deadly weapon. Ida Delaney was arrested for the 1959 stabbing, but she was not charged because of lack of prosecution by the complaining witness.

## THE TRIAL JUDGE'S RULING

Appellant offered the evidence of past misconduct and the opinion evidence, citing Tex.R.Crim.Evid. 405. The State responded by urging the court to "perform a balancing test to determine whether the probative value of the evidence ... outweighs the prejudicial effect of such testimony." The State objected that the evidence about the 1971 assault on Officers Kerckhoff and James was too remote, and made the same objection to James Delaney's testimony about the two shootings. Appellant argued the evidence was admissible to show that Ida Delaney was the aggressor. He argued that the excluded evidence was relevant to show her aggressive character, thus making it more likely to be true, as appellant and Officers Romero and Robert Gonzales had testified, that she fired a gun at them with little provocation to begin the fatal encounter. The trial court ruled as follows:

> The court's ruling as to the events of 19 years ago [Kerckhoff's and James' testimony], if the witness was here and alive and not deceased, she could not be impeached by those matters. The fact that she is deceased does not make them admissible. The probative value does not substantially outweigh its prejudicial effect, so that objection is sustained at this time.

In later sustaining the State's objections to Mr. Delaney's testimony, the trial judge stated, "probative value does not substantially outweigh the prejudicial effect."

## THE MERITS

The State argued the evidence should be excluded for two reasons. First, it was remote in time. Second, it was not relevant because it was undisputed that Ida Delaney fired first when she and appellant finally came face to face. The State argued this plainly made her the first aggressor; thus, no evidence was needed to prove she was, and anything that happened at the beginning of the transaction, such as Delaney firing at the men, was of no consequence in the lawsuit. We disagree with these contentions and with the trial judge's conclusion that the evidence should be excluded because its probative value did not substantially outweigh its prejudicial effect.

Whether Ida Delaney fired at appellant's car on the Gulf Freeway was a matter of tremendous importance in this case. Contradictory evidence on that subject constitutes a major part of the trial record, and the parties devoted more attention during final argument to that subject than to any other. The State, in particular, spent a large portion of its jury argument declaring appellant and his witnesses to be liars who made up the shooting story in order to justify their actions.

Texas Rule of Criminal Evidence 401 defines relevant evidence as evidence having any tendency to make the existence of *a fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence. If the jury had heard that Ida Delaney assaulted Officers Kerckhoff and James and her former husband as stated in the bill of exceptions, it might well have found it more likely that she fired at appellant on the Gulf Freeway. Thus, the evidence was relevant, as many federal and state courts have held. *People v. Tedtaotao*, 896 F.2d 371, 373 (9th Cir. 1990); *United States v. Greschner*, 647

F.2d 740, 741, 743 (7th Cir.1981) (evidence relevant both to general propensity for violence and for specific motive to attack the defendant); *Bowden v. McKenna,* 600 F.2d 282, 284 (1st Cir.1979) (evidence relevant to show both general violent character and specific motive to attack police officers). *See* the similar facts in *United States v. Burks,* 470 F.2d 432, 434–38 (D.C.Cir.1972) (reversal due to erroneous exclusion from evidence of deceased's plea of guilty to crime of violence and of testimony by deceased's spouse concerning details of deceased's violent acts, citing *Dempsey v. State,* 159 Tex.Crim. 602, 266 S.W.2d 875 (1954), with approval for its decision on "remarkably similar" facts). The evidence is not made irrelevant by the fact that Ida Delaney fired first when she confronted appellant face to face. The issue is who was the first aggressor, not who fired first during the fatal moments.

 Texas law allows homicide defendants to show a deceased's prior acts of aggression in order to help the jury to decide who was the aggressor. Evidence of a pertinent character trait of a victim is admissible when offered by the accused. Tex.R.Crim.Evid. 404(a)(2). Specific acts of misconduct are admissible "in cases in which character or trait of character of a person is an essential element of a charge, claim, or defense...." Tex.R.Crim.Evid. 405(b). Reputation testimony and opinion testimony are proper ways to prove character. Tex.R.Crim.Evid. 405(a). A victim's aggressive character is an essential element of the defense of self-defense. As one authority has written of the identical federal rule of evidence, "[T]he Committee used the phrase 'an essential element of a charge, claim, or defense' as a more meaningful elaboration of the original phrase 'in issue.' *The phrase has the same meaning as 'consequential fact.'*" 2 J. Weinstein & M. Berger, Evidence § 405[04] (1992) (emphasis added).

In Texas, as elsewhere, there must be some evidence of aggression by the deceased in order to raise the issue of self-defense; thus,

[I]t is the rule that reputation evidence concerning the deceased's violent character or prior specific acts of violence committed by him are admissible as they tend to explain the deceased's conduct; because this evidence is probative of 'who was in fact the aggressor' in the fray (as opposed to 'what the defendant thought'), the defendant need not show his own awareness of it at the time of the offense, but like all evidence, it must be established by admissible evidence at trial.

*Thompson v. State,* 659 S.W.2d 649, 653 (Tex.Crim.App.1983).

Texas courts have long held that exclusion of such evidence constitutes reversible error. The leading case is *Dempsey v. State,* 159 Tex.Crim. 602, 266 S.W.2d 875 (1954). Many cases have been reversed for the same error, including *Lowe v. State,* 612 S.W.2d 579 (Tex.Crim.App. [Panel Op.] 1981), *Wood v. State,* 486 S.W.2d 359 (Tex. Crim.App.1972), *Lewis v. State,* 463 S.W.2d 186 (Tex.Crim.App.1971), *West v. State,* 154 Tex.Crim. 502, 229 S.W.2d 623 (1950), *Henry v. State,* 151 Tex.Crim. 284, 207 S.W.2d 76 (1947), and *Meeks v. State,* 135 Tex. Crim. 170, 117 S.W.2d 454 (1938). Even in cases that were affirmed on appeal, the admissibility of such evidence has been recognized. *Gutierrez v. State,* 764 S.W.2d 796 (Tex.Crim.App.1989); *Thompson,* 659 S.W.2d at 653; *Beecham v. State,* 580 S.W.2d 588, 590 (Tex.Crim.App. [Panel Op.] 1979); *Nichols v. State,* 504 S.W.2d 439, 441 (Tex.Crim.App.1974); *Mahaffey v. State,* 471 S.W.2d 801, 808–809 (Tex.Crim. App.1971) (op. on reh'g). The rules of evidence specifically provide that such evidence is admissible. Tex.R.Crim.Evid. 404(a)(2), 405(a), (b). Thus, the only question is whether this admissible evidence was properly excluded on special grounds.

The State contends that two special grounds justify exclusion. First, the State contends the evidence was too remote to have any probative value. Second, the State objected, and the trial judge ruled, that the evidence should be excluded because "the probative value does not substantially outweigh its prejudicial effect."

We hold that neither reason justifies excluding the evidence.

■ The State has not directed us to any case where a court either excluded such evidence because of remoteness or even discussed that possibility. None of the cases cited above discusses remoteness.

In *Ray v. State*, 80 Tex.Crim. 461, 190 S.W. 1111 (1917), a murder defendant presented evidence of the deceased's reputation for violence "going back ... some 15 or 16 years." *Id.*, 190 S.W. at 1112. The State, in rebuttal, presented witnesses who knew the deceased 15 to 20 years before the killing. Although the opinion did not identify the basis for the appellant's complaint about the State's evidence and held that any error was waived, it never mentioned that either party's 15 to 20–year–old reputation evidence might be too remote. Remoteness was not mentioned in *Dempsey*, where the deceased's violence approximately seven years before was held admissible. Remoteness was not mentioned in *Thompson*, where the deceased's misconduct more than five years before would have been admissible if it had been sufficiently violent.

Remoteness was mentioned in *Sanne v. State*, 609 S.W.2d 762, 772 (Tex.Crim.App. 1980), where, in affirming a capital murder conviction, the court unanimously held that any objection to remoteness of opinion testimony concerning reputation for truth goes to the weight of the testimony, not to its admissibility. For this proposition, the court cited with approval the opinion in *Brown v. Perez*, 89 Tex. 282, 34 S.W. 725, 726–28 (1896). In *Brown*, the trial judge allowed two witnesses to testify of a party's bad reputation for truthfulness. One witness had not seen the party for more than 29 years, and the other had not seen him for at least 20. *Id.*, 34 S.W. at 726. The party had lived outside the witnesses' community throughout that period. The supreme court gave a cogent explanation of why evidence so old was admissible to show character:

If, *during the long period the appellant resided in Johnson County, his general reputation for truth and veracity were* bad, this was a fact, considering his mature age when he was there residing, which the jury might consider in determining whether his evidence was entitled to credence. *The law does not presume that a person of mature age, whose reputation has been notoriously bad ... has so reformed as to have acquired a different reputation.* The evidence offered may not have been entitled to so much weight as if it had related to his reputation in the community in which he lived at the time the testimony was given; yet *it was such as the jury might consider and was subject to rebuttal by evidence showing a different reputation at the time of the trial* in the community in which he resided.... [P]laintiff could have summoned his neighbors who knew him at that time ... *The decision rests upon the legal presumption that a character once established continues until a change is shown.... The inquiry is not in its nature limited as to time. The character of the habitual liar or perjurer several years since would go, at least, to fortify the testimony which would now fix the same character to the same person.* Witnesses must speak on this subject on the past tense. Character cannot be brought into court and shown to them at the moment of trial. *A long established character for good or for evil is always more striking and more to be relied on than that of a day or a month....* It is true that this evidence may not have been entitled to as much weight as would evidence showing that it was bad at the time of the trial by the testimony of witnesses who where then acquainted with his reputation among his neighbors, but still it was beyond all doubt, competent to be considered by the jury.... The witness ... might have reformed since he left Marshall county, but it does not necessarily follow that he did reform. If he did so reform, it was quite as easy for the plaintiff to prove that fact as for the defendant to prove that his character still continued bad.... We do not mean to say that any slight contradiction in the testimony of a wit-

ness would justify the resort to this kind of evidence at so remote a date, nor that it is entirely in the discretion of the trial judge to determine the question of its admissibility. It must, however, ... be largely left to his discretion ... except where the circumstances clearly show that the discretion allowed has been improperly exercised.... [W]here the evidence of the witness is such that it fairly raises the issue of his veracity, or where the testimony of other witnesses relating to his character at or near the time of trial tends to impeach his character for truth and veracity.... resort may be had to evidence of the reputation of such witness at the place of his former residence and at a time remote from the time of trial. No definite rule can be stated which will apply to all cases....

Under these circumstances, the testimony of the witnesses introduced by the plaintiff to impeach his character, although at a very remote period, was admissible to go to the jury, its weight and value to be determined by them.... *If his character had become better, defendants could have made the proof....*

34 S.W. at 727–28 (emphasis added).

We conclude that evidence admissible under rules 404(a)(2) and 405 is not excludable because of remoteness. The federal cases show that relevant evidence even older than 19 years may be admitted against a defendant under a similar federal rule of evidence. *Compare United States v. Falco*, 727 F.2d 659, 665 n. 4 (7th Cir.1984) (prior acts of misconduct occurring 29 years, 19 years, and 3 years before the crime on trial were properly admitted against the defendant under rule 404(b) because, "It is the pattern of conduct represented by the prior convictions, and not

the age of each separately considered, that is critical to their relevance here."). "No authority supports the proposition that a bad act loses all probative value after a given period of time." *United States v. McCollum*, 732 F.2d 1419, 1424 n. 3 (9th Cir.1984) (trial judge properly admitted 12–year–old robbery conviction against defendant, under rule 404(b)); *United States v. Terry*, 702 F.2d 299, 316 (2d Cir.1983) (trial judge properly admitted 20–year old narcotics conviction against defendant, under rule 404(b)). *See generally International Security Life Ins. Co. v. Melancon*, 463 S.W.2d 762, 767 (Tex.Civ.App.—Beaumont 1971, writ ref'd n.r.e.) ("The objection that the testimony was not limited as to time or place is without merit.... Character is a more or less permanent quality, and by the very nature of the subject, is not susceptible of proof as to a period finite in time," citing Wigmore); *Clark v. Hendricks*, 164 S.W. 57, 58 (Tex.Civ.App.—San Antonio 1914, no writ).

The rules allowing evidence of specific instances of misconduct to prove character contain no limitation on time. TEX. R.CRIM.EVID. 404(a)(2), 405(b). This is significant because the rules impose time limitations on some evidence, such as prior convictions used to impeach a witness' testimony. Texas Rule of Criminal Evidence 609 contains a general limitation of 10 years for criminal convictions offered "for the purpose of attacking the credibility of a witnesses." That rule does not apply to the excluded opinion testimony of Officers James and Kerckhoff nor to James Delaney's excluded testimony about the shootings because that testimony did not show Ida Delaney had been convicted of a crime. In addition, rule 609 does not apply because the excluded evidence was not offered to attack any witness' credibility.[2] *Gresch-*

---

2. In sustaining the State's objection to Kerckhoff's and James' testimony about Delaney's bad reputation and about her 1971 assault on them, the trial court stated that "if the witness were here and alive and not deceased, she could not be impeached by these matters." The trial judge apparently assumed that if Ida Delaney had survived, her testimony would have contradicted the excluded evidence. This assumption was unwarranted. At the very least, it would have

been difficult for her to deny the 1971 assault on James and Kerckhoff because she pleaded guilty to it. Nor can we automatically assume that she would have denied assaulting James Delaney twice or that she would have denied firing at appellant's car. The *State* took those positions at trial; thus, the excluded evidence contradicted the *State's theory*, but like the trial judge, we can never know if the excluded evidence would have impeached *Delaney's* ac-

*ner,* 647 F.2d at 742 n. 1 (no issue of prejudice because person whose violent character was shown was not a party or a witness); *see also Bowden,* 600 F.2d at 284 (evidence of prior crime admissible under Fed.R.Evid. 404(b) despite prejudice). The excluded evidence was offered to show a pertinent character trait of Ida Delaney in a case where that trait, aggressiveness, was an essential element of appellant's claim of self-defense; thus, it was specifically admissible under rules 404(a)(2) and 405.

■ This brings us to the State's final contention. At trial, the prosecutor objected, and the trial judge ruled, that the evidence from Officers James and Kerckhoff and from James Delaney should be excluded because its probative value did not substantially outweigh its prejudicial effect. We hold that this was not a proper basis to exclude the evidence because it is the opposite of the controlling legal standard.

As stated, the excluded testimony of Officers Kerckhoff and James and Mr. Delaney was relevant. Texas Rule of Criminal Evidence 402 provides:

> All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules prescribed pursuant to statutory authority.

Rule 403 is the sole authority the State relies on to argue that the evidence of Officers James and Kerckhoff and of James Delaney, even if relevant, was properly excluded. Texas Rule of Criminal Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

■ The trial judge excluded the evidence because its probative value did not substantially outweigh its prejudicial effect. That is the opposite of the correct

counts of any of these events. Before evidence can be excluded because it constitutes improper

legal standard. In order to exclude relevant evidence, it must be shown that the prejudicial effect substantially outweighs the probative value, not that the probative value substantially outweighs the prejudicial effect. For example, if the probative value of relevant evidence outweighs, but does not substantially outweigh, its prejudicial effect, the evidence cannot be excluded under rule 403. And if the probative value of relevant evidence is of equal weight with its prejudicial effect, the evidence cannot be excluded under rule 403. Finally, if the prejudicial effect outweighs, but does not substantially outweigh, the probative value, the evidence cannot be excluded under rule 403. Only if the danger of unfair prejudice substantially outweighs the probative value may the evidence be excluded under rule 403. Thus, the trial court did not make the finding required by rule 403.

■ Moreover, it would have been an abuse of discretion for the trial judge to have found that the probative value of the evidence from Officers Kerckhoff and James Delaney was substantially outweighed by the danger of unfair prejudice. Rule 403 does not authorize exclusion of evidence because it creates prejudice; it authorizes exclusion of evidence only if it creates *unfair* prejudice that *substantially* outweighs its probative value. The State has not cited any case that excluded evidence of a deceased's prior acts of violence when a homicide defendant offered that evidence to prove self-defense. The State has not cited any case that employed a rule 403 (or any other) balancing test for this type of evidence. The cases and the specific provisions of rules 404(a)(2) and 405(b) suggest that, in Texas, prejudice to the State arising from evidence about a deceased's prior acts of violence is considered to be fair, not unfair, prejudice. If that is the state of the law, there is nothing to be balanced and no discretion to be exercised.

Relying on *Montgomery v. State,* 810 S.W.2d 372 (Tex.Crim.App.1990), the State urges us to conduct an analysis under rule 403 and consider:

impeachment of a witness, it must first impeach a witness.

1. Whether the ultimate issue to which the evidence was relevant was seriously contested;

2. Whether appellant placed other convincing evidence before the jury on the same issue; and

3. Whether the probative value of the excluded evidence was compelling.

If such a balancing of interests is required, we nevertheless conclude it was error to exclude the evidence. The ultimate issues, self-defense and the identity of the first aggressor, were vigorously contested. Whether Ida Delaney fired at the officers on the Gulf Freeway was, by far, the most important topic for jury argument. There was no more contested, and no more important, issue in this case. In a similar case, the government similarly argued that such evidence was properly excluded because it was "distracting" and cumulative. Labelling this contention "virtually frivolous," the court wrote, "Since the evidence of (the victim's) character is relevant to the defendant's defense, we do not see how it could be 'distracting' any more than any other acceptable defense theory." *Greschner*, 647 F.2d at 742. Thus, this factor suggests the evidence should have been admitted.

The State's second proposed factor is whether appellant had other convincing evidence. The only other evidence of Ida Delaney's character was the opinion testimony of Officer Hake and of James Delaney. Officer's Hake's opinion was that Ida Delaney's reputation was bad and that she was violent. However, this opinion was impeached when he admitted it was based on a single 15–minute conversation about how to resist a home burglar's forcible invasion, in which Ida Delaney said she would shoot anybody who approached her. Given the context of the conversation and given Hake's minimal exposure to Delaney, that evidence was weak. The only other evidence was from James Delaney, a divorced spouse who litigated against Ida Delaney over property and child support for years after their divorce. The testimony of a hostile former spouse is naturally suspect, and the State, in argument, attacked James Delaney's testimony on that basis. Without evidence of the two assaults on him to back it up, James Delaney's reputation testimony was weak. This second factor suggests the evidence should have been admitted because appellant did not have a quantity of other, convincing evidence that Ida Delaney was aggressive and violent.

The State's third proposed factor is whether the probative value of the excluded evidence was compelling. The State concedes that the three prior assaults resemble Ida Delaney's conduct in this case because they involved either shootings or assaults on police officers. We conclude that a reasonable jury may have found this evidence compelling.

Because Texas case law and rules of evidence specifically allow such evidence, we conclude that admitting it here would not have led to unfair prejudice, confused the issues, misled the jury, or caused undue delay because it is the type of evidence normally admitted to show the deceased was the first aggressor. Moreover, admitting the evidence would not have resulted in needless presentation of cumulative evidence because no other evidence remotely resembling its persuasive power on this issue was admitted.

Finally, the State cites *Bachhofer v. State*, 633 S.W.2d 869 (Tex.Crim.App.1982), which held that an extraneous offense four years and four months old was too remote to use against a criminal defendant. The State argues that if that offense was too remote to use against a criminal defendant, the older offenses in this case should be too remote to use against the State. We doubt that *Bachhofer* is a good law today, after the enactment of rule 404. Federal courts construing an identical rule of evidence have allowed evidence of a defendant's prior crimes that were older than those of Ida Delaney. *Falco*, 727 F.2d at 665 n. 4 (29 years and 19 years); *Terry*, 702 F.2d at 316 (20 years). The State cites no case where evidence relevant to self-defense was excluded because of remoteness.

Given the importance in this trial of deciding whether Ida Delaney was the first aggressor, the exclusion of the evidence was harmful. Tex.R.App.P. 81(b)(2); *Bowden*, 600 F.2d at 286; *Greschner*, 647 F.2d at 743.

Points of error three and four are sustained.[3]

■ In point of error five, appellant contends the jury instruction on voluntary manslaughter was fundamentally erroneous because it authorized his conviction even if the jury had a reasonable doubt about whether he acted under the influence of sudden passion.

The jury acquitted appellant of murder and convicted him of voluntary manslaughter, the only difference being that voluntary manslaughter is a murder committed under the influence of sudden passion arising from adequate cause, while murder is committed by a person not in the grip of sudden passion. Tex.Penal Code Ann. § 19.04(a) (Vernon 1989). This case raises again the difficult issue of who, the State or the defendant, has the burden to prove or disprove the existence of sudden passion when voluntary manslaughter is presented to the jury as a lesser included offense of murder. Our highest criminal law court has referred to its own opinions on this subject as "legal contortion," as "legal gymnastics," and as having led to "ludicrous" results. *Bradley*, 688 S.W.2d at 849, 853 n. 13.

Appellant complains that the jury was instructed in one part of the charge to convict him of voluntary manslaughter if it had a reasonable doubt whether he acted under sudden passion, and, in the immediately following part, the jury was instructed to acquit him if it had a reasonable doubt of the same issue. The charge provided:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 31st day of October, 1989, in Harris County, Texas, the defendant, Alex Gonzales, did then and there unlawfully intentionally or knowingly cause the death of Ida Lee Delaney, by shooting Ida Lee Delaney with a deadly weapon, namely, a firearm, but you further find and believe from all the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, *or if you have a reasonable doubt as to whether the defendant so acted under the immediate influence of sudden passion arising from an adequate cause;* or if you find from the evidence beyond a reasonable doubt that on or about the 31st day of October, 1989, in Harris County, Texas, the defendant, Alex Gonzales, did then and there unlawfully intend to cause serious bodily injury to Ida Lee Delaney, and did cause the death of Ida Lee Delaney by intentionally or knowingly committing an act clearly dangerous to human life, namely, by shooting Ida Lee Delaney with a deadly weapon, namely, a firearm, but you further find and believe from all the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, *or if you have a reasonable doubt as to whether the defendant so acted under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter.*

Unless you so find from the evidence beyond a reasonable doubt *or if you have a reasonable doubt thereof, you will acquit the defendant of voluntary manslaughter.*

(Emphasis added.)

Appellant did not object to the charge on this basis. Consequently, he is entitled to

---

3. There was no error in excluding Sgt. Clappart's testimony concerning the contents of the 1959 offense report of a stabbing incident involving Ida Delaney. The evidence was not admissible because Clappart had no personal knowledge of that act. *Dempsey*, 266 S.W.2d at 877–78; *Nichols*, 504 S.W.2d at 441.

reversal on this point only if there was error that caused him egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim.App.1985) (op. on reh'g).

In determining whether there is error and egregious harm requiring reversal, we look to the entire jury charge. The immediately preceding paragraphs correctly instructed the jury to convict appellant of murder, if, and only if, it found beyond a reasonable doubt that he was not acting under sudden passion. *Castillo–Fuentes v. State*, 707 S.W.2d 559, 561 (Tex.Crim. App.1986). Under this instruction, the jury acquitted appellant of murder.

The challenged instruction first placed the burden of proof on appellant to disprove the existence of sudden passion by telling the jury to convict him of voluntary manslaughter if it had a reasonable doubt as to whether he acted under sudden passion. However, the next paragraph put the burden of proof on the State to prove the absence of sudden passion by telling the jury to acquit appellant of voluntary manslaughter if it had a reasonable doubt whether he acted under sudden passion.

The State cites no case, and we have found none, that requires a defendant to prove the absence of sudden passion under these circumstances. *See State v. Lee*, 818 S.W.2d 778, 782 (Tex.Crim.App.1991); *Acosta v. State*, 742 S.W.2d 287, 288 (Tex. Crim.App.1986); *Bradley*, 688 S.W.2d at 849–53. The State concedes that "the language used was unwieldy and perhaps even erroneous...." We hold it was error to include the first two italicized reasonable doubt provisions because they required appellant to prove beyond a reasonable doubt that he was not acting under sudden passion. Appellant had no such burden of proof. *Acosta*, 742 S.W.2d at 288; *Bradley*, 688 S.W.2d at 853. The remaining issue is whether this error caused appellant egregious harm.

Because we have sustained points of error three, four, and six, each of which requires reversal and a new trial, we need not decide whether this error egregiously harmed appellant. Even if it did, the remedy, reversal and remand, would be the same as we have already ordered by sustaining the other points of error. Upon retrial, the jury charge should not include the first two italicized instructions.

The Texas Court of Criminal Appeals has often cited with approval charges recommended by Paul J. McClung. In JURY CHARGES FOR TEXAS CRIMINAL PRACTICE (rev. ed. 1992), Mr. McClung proposes the following jury charge on voluntary manslaughter:

> Now, if you find from the evidence beyond a reasonable doubt that on or about ___ day of _____ 19__ in _____ County, Texas, the defendant, AB, did intentionally or knowingly cause the death of an individual, namely CD, by shooting him with a firearm, namely, a gun while he, the defendant, was acting under the immediate influence of sudden passion arising from an adequate cause, then you will find the defendant guilty of voluntary manslaughter ...

> Unless you find that defendant is guilty of voluntary manslaughter beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of voluntary manslaughter.

*Id.* at 89–90. We call it to the attention of the bench and bar.

▮ In point of error six, appellant contends the trial court erred by instructing the jury, over his objection, as follows:

> Voluntary intoxication does not constitute a defense to the commission of a crime. "Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Appellant requested an accompanying instruction that voluntary intoxication does not limit one's right of self-defense. When the trial judge denied that instruction, appellant objected that the instruction on intoxication was a harmful comment on the evidence.

The trial judge "shall deliver to the jury a written charge ... not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM.P.ANN. art. 36.14 (Vernon Supp. 1992). We must decide whether the quoted instruction violated this statute.

Whether appellant was intoxicated was a major topic of dispute in this trial. The State claimed he was; appellant denied it. Both sides explained to the jury panel during voir dire that, under Texas law, voluntary intoxication was not a defense to crime. At least three expert witnesses and a number of non-expert witnesses, including appellant, testified on the issue. Peter Christian, the laboratory administrator for the Houston Police Department, testified that appellant's blood alcohol level soon after the shooting was .19 percent; that a person whose blood alcohol level is .10 percent is under the influence of alcohol and has lost the normal use of their mental and physical faculties; that a person with blood alcohol level of .19 percent would be intoxicated. He also testified that adrenalin "can override some of the effects of alcohol for a short period of time...."

Another State's witness, Dr. Joseph Jachimczyk, the Harris County Medical Examiner, testified that a person with blood alcohol level of .19 percent would be under the influence of alcohol. He testified that adrenalin would cause a person to be less symptomatic of intoxication.

Dr. Fason, a psychiatrist, testified to a hypothetical question involving an individual who had consumed 10 to 14 drinks over a five to six hour period. He testified that in such a person undergoing a stressful event, such as having a gun fired at him, "as the adrenalin floods forth we become more alert, and an individual who might be legally intoxicated would not necessarily be *functionally inebriated with the flow of the adrenalin.*" He testified further that the flow of adrenalin would not lower the alcohol level of the blood, but would only counteract the alcohol's depressant effect on the central nervous system. He concluded that for such a hypothetical person and situation, the adrenalin "would certainly markedly reduce the depressant effect of the alcohol to where they may function quite normally." Appellant testified that he was not intoxicated, and claimed he had "absolutely full use of [his] mental and physical facilities" during these events. Other witnesses testified that he did not appear intoxicated.

▇ A charge on voluntary intoxication generally belongs in the court's charge at the punishment stage, not at the guilt/innocence stage. *Rodriguez v. State*, 513 S.W.2d 594, 595 (Tex.Crim.App.1974). This is because TEX.PENAL CODE ANN. § 8.04(b) (Vernon 1989) provides that evidence of temporary insanity caused by intoxication may be introduced in mitigation of the penalty for an offense. However, "when temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with [section 8.04(a) that voluntary intoxication is not a defense to crime]." TEX.PENAL CODE ANN. § 8.04(c). (Vernon 1989).

Section 8.04(c) does not justify the instruction in this case, however, because appellant did not claim temporary insanity or that his drinking excused his acts. *Compare Jaynes v. State*, 673 S.W.2d 198, 201–202 (Tex.Crim.App.1984) (instruction proper at guilt stage where evidence showed that because of intoxication, defendant was oblivious to her criminal conduct); *Evilsizer v. State*, 487 S.W.2d 113, 114–17 (Tex.Crim.App.1972) (instruction proper at guilt stage where defendant claimed he was temporarily insane due to voluntary intoxication); *Valdez v. State*, 462 S.W.2d 24, 27 (Tex.Crim.App.1970) (instruction proper at guilt stage where defendant admitted he was drunk, but denied committing the offense or participating in it, and claimed he was asleep during the offense.) Thus, we hold the trial judge erred by

giving the instruction, and we must now decide whether appellant was harmed.

The only conclusion the jury could have drawn from this instruction was that the trial judge agreed with the State that appellant was intoxicated. That issue was hotly disputed, and appellant was entitled to have the jury consider it without knowing the judge's apparent opinion. Moreover, the prosecutor discussed the effect of intoxication on appellant's right to self-defense. He argued to the jury that "the law is really pretty logical and pretty reasonable, and you've got to look at it from a logical standpoint what a reasonable person would do, not somebody who has had too many drinks, not from somebody who has been out playing several hours after work."

In *Arline v. State*, 721 S.W.2d 348, 351 (Tex.Crim.App.1986), the court held that "the presence of *any* harm, regardless of the degree, which results from preserved charging error, is sufficient to require reversal of the conviction. Cases involving preserved charging error will be affirmed only if *no* harm has occurred." (Emphasis in original.) We cannot conclude that no harm occurred. *See* TEX.R.APP.P. 81(b)(2).

Point of error six is sustained.

■■■ In point of error seven, appellant contends the trial judge erred by instructing the jury to consider whether appellant provoked the difficulty because no evidence supported the instruction.

The judge instructed the jury as follows:

You are further instructed that the law of self-defense is qualified to the extent that a person is not justified in using force or deadly force if he provoked the other person's use or attempted use of unlawful force, unless:

(A) the person abandons the encounter, and

(B) the other person, nevertheless, continues or attempts to use unlawful force against the person claiming self-defense.

You are further instructed as part of the law of this case, and as a qualification of the law on self-defense, that if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, Alex Gonzales, immediately before the difficulty then and there did some act, or used some language, or did both, if any, with the intent to produce the occasion to bring on the difficulty and kill Ida Lee Delaney, and that such words and conduct on the defendant's part, if there was such, were reasonably calculated to, and did provoke a difficulty, and that on such account the said Ida Lee Delaney attacked the defendant, or reasonably appeared to the defendant to so attack him, or to be about to attack him, and that the defendant then killed the said Ida Lee Delaney, in pursuance of his original design, if you find there was such, or if the defendant provoked the difficulty that resulted in the death of the deceased, and by his own wrongful act, if any, produced a necessity for taking the life of the deceased, and you so find beyond a reasonable doubt, you will find against the defendant's claim of self-defense.

On the other hand, if you find from the evidence that the acts done or language used by the defendant, if any, were not, under the circumstances reasonably calculated or intended to provoke a difficulty, or an attack by the deceased upon the defendant, or if you have a reasonable doubt thereof, then in such event, the defendant's right of self-defense would in no wise be lessened, and in such event you will decide the issue of self-defense in accordance with the law as above stated.

In *Matthews v. State*, 708 S.W.2d 835, 837–38 (Tex.Crim.App.1986), the court held:

Viewing the evidence in the light most favorable to the verdict, a charge on provoking the difficulty is properly given when:

1. Self-defense is an issue;

2. There are facts in evidence which show that the deceased made the first attack on the defendant; and

3. The defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have a pretext for inflicting injury upon the deceased.

Here, self-defense was an issue. As to the second factor, defense witnesses testified that Delaney made the first attack on appellant at the beginning of the encounter, and it is undisputed that she fired first at the end of the encounter. Thus, both the first and second factors support giving the charge. As to the third factor, it is undisputed that appellant did some acts that were calculated to bring on the difficulty, such as following Delaney for 12 miles in a provocative manner, approaching her car with a drawn gun, opening the door of her car with a drawn gun, and attempting to remove her from her car while displaying a drawn gun. The only remaining issue is whether there was evidence that appellant did so, in the words of *Matthews*, "in order to have a pretext for inflicting injury upon the deceased."

The *Matthews* opinion quoted with approval the opinion in *Norwood v. State*, 135 Tex.Crim. 406, 120 S.W.2d 806 (1938). In *Norwood*, the court approved a jury charge on provoking the difficulty that is virtually identical to the charge in this case. *Id.*, 120 S.W.2d at 808. The *Norwood* charge has been cited as a model for trial judges to follow. *Dirck v. State*, 579 S.W.2d 198, 203–204 n. 5 (Tex.Crim.App. [Panel Op.] 1978) (op. on reh'g). The *Norwood* charge does not limit the instruction on provoking the difficulty only to cases where the defendant acted "with the intent ... to produce the occasion for killing the deceased," or "in pursuance of his original design." 120 S.W.2d at 808. In addition, it provides that the jury may find the defendant provoked the difficulty if he "by his own wrongful act ... produced a necessity for taking the life of the deceased...." *Id.* Under the evidence in this case, viewed most favorably to the verdict, a rational jury could have concluded, in the words of this jury charge and of the *Norwood*

charge, that appellant "provoked the difficulty that resulted in the death of the deceased, and by his own wrongful act ... produced a necessity for taking the life of the deceased."

In *Garcia v. State*, 522 S.W.2d 203 (Tex. Crim.App.1975), the court held that a charge on provoking the difficulty was proper because of the defendant's aggressive actions in chasing the deceased's car, in blocking the car from further travel, in immediately leaving his own truck and approaching the deceased's car with gun drawn, and in firing into the car. The court held that the charge on provoking the difficulty was justified, even though "testimony sharply conflicted.... as to who fired first." *Id.* at 206. The court wrote:

> In every case where the acts and conduct of the accused were the cause of an attack upon him, the issue of whether they were reasonably calculated to provoke the difficulty is a question of fact for the determination of the jury under appropriate instructions from the court.

*Id.*

Appellant relies on *Dirck, Howle v. State*, 119 Tex.Crim. 17, 43 S.W.2d 594 (1931), and *Dugan v. State*, 86 Tex.Crim. 130, 216 S.W. 161 (1919). In *Dugan* and in *Howle*, the deadly assault began almost immediately following the fighting words. Violence followed speech so quickly that the courts held, as in *Dirck*, that a charge on provoking the difficulty should not be given where the only question is who made the first attack. The facts here are not like those in *Dugan* and *Howle*, but more like those in *Garcia*, where the charge was properly given. We do not find *Dirck* controlling because the opinion contains almost no facts and the result was based on three separate independent grounds, two of which did not deal with whether the charge should be given, but upon error in the contents of the particular instruction. 579 S.W.2d at 203–204.

We hold the trial judge did not err in giving the instruction on provoking the dif-

ficulty. Based on appellant's conduct, a rational jury could have concluded beyond a reasonable doubt that, in the words of *Norwood*, appellant "by his own wrongful act produced a necessity for taking the life of (Ida Delaney)."

Point of error seven is overruled.

■ In point of error eight, appellant contends the trial court erred by refusing to instruct the jury that appellant had the right to arm himself.

Appellant directs us to volume 8, page 38, of the statement of facts, contending he there presented to the trial court the same objection that is the basis for this point of error. We find no such objection. At the cited page, appellant objected as follows:

[W]e would request an instruction to the jury under section 38.03 of the penal code regarding resisting arrest or search, and ask that the court instruct the jury that a person does commit an offense if he intentionally permits or obstructs a person who he knows is a peace officer from effecting an arrest or search of the actor or another by using force against the peace officer or another, it is no defense to prosecution under this section, under this law, that the arrest or search was unlawful and that an offense under this section is a felony of the third degree, if the actor uses a deadly weapon to resist the arrest or search.

This objection does not comport with this point of error. The authority cited in the objection, TEX.PENAL CODE ANN. § 38.03 (Vernon Supp.1992), provides it is a third degree felony to use a deadly weapon to resist an arrest or search by a peace officer. Nothing in that section pertains to the right of a peace officer to arm himself. Because appellant did not object at trial on the basis now asserted on appeal, he is entitled to reversal only if there was error in the charge that caused him egregious harm. *Arline*, 721 S.W.2d at 351.

We find that appellant was not egregiously harmed by this omission. The jury instructions repeatedly conveyed the message that appellant had the right to arm himself. For example, the charge provided:

You are instructed that a police officer has official duties to act in the capacity of a police officer 24 hours a day, even when he is off duty.

You are instructed that a police officer may pursue and arrest an offender without a warrant for any offense committed in the police officer's presence or within his view.

Whenever a felony has been committed in the presence of a police officer, or within his view, and the offender is about to escape, so that there is no time to procure a warrant to arrest, a police officer, may, without warrant, pursue and arrest the accused.

Each law enforcement officer shall be a conservator of the peace in his jurisdiction, and shall arrest all offenders against the laws of the State, in his view or hearing, and take them before the proper court for examination or trial. He shall quell and suppress all assaults and batteries, affrays, insurrections and unlawful assemblies. He shall apprehend and commit to jail all offenders until an examination or trial can be had.

It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case where he is authorized by the provisions of the law, interfere without warrant to prevent or suppress crime. He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

The quoted instructions immediately preceded 2½ pages telling the jury when a peace officer is justified in using deadly force, more than two pages concerning appellant's right to use deadly force in self-defense, an instruction on appellant's right to continue firing until the danger had

passed, and two pages concerning appellant's right to use deadly force to defend third persons. Although the prosecutor argued to the jury that appellant was not justified in using deadly force because Ida Delaney had a right of self-defense against him that he could not abridge, appellant points to no place where the State argued that appellant had no right to arm himself.

We hold that the cumulative effect of these instructions was to inform the jury that appellant had the right to arm himself; thus, we find that he suffered neither harm nor egregious harm. TEX.R.APP.P. 81(b)(2).

Point of error eight is overruled.

■ In the ninth point of error, appellant asserts the trial court erred by instructing the jury to view the evidence regarding self-defense, in part, from the standpoint of the deceased. Appellant contends this improperly limited his right of self-defense because the jury should view the evidence regarding self-defense from the standpoint of the defendant alone.

Appellant complains of the first italicized portion of the following instruction:

> You are further instructed, however, if you believe from the evidence beyond a reasonable doubt that at the time and place in question that the deceased, Ida Lee Delaney, was not using or attempting to use unlawful force or unlawful deadly force on the defendant, *as viewed from her standpoint,* namely that her use of force or deadly force, if any, was justified under the circumstances as set out above, *and if you further believe* that the defendant did not reasonably believe that deadly force when and to the degree used, if it was, was immediately necessary to protect himself against the use or attempted use of unlawful deadly force, *as viewed from his standpoint alone,* or that a reasonable person in the defendant's position at that time would have retreated, then you will find against the defendant on his plea of self-defense.

(Emphasis added.)

Appellant objected that the italicized word "her" was improper, and should have

said "the accused's standpoint," rather than "her [Delaney's] standpoint." The trial judge overruled the objection.

This instruction told the jury that, in deciding whether *Delaney's* acts were justified, the jury was to decide whether the force *she* used was lawful, judged from *her* standpoint. In three separate places in the charge, the jury was told to judge *appellant's* claim of self-defense from *his* standpoint alone. Finally, the instruction told the jury that it must find against appellant's plea of self-defense, if it believed beyond a reasonable doubt that *Delaney's* acts were justified from *her* standpoint *and it further believed* that appellant, viewing the events from his standpoint alone, knew that Delaney's acts were justified, i.e., appellant did not reasonably believe that Delaney's use of force was unlawful.

A similar instruction was approved in *Bennett v. State,* 726 S.W.2d 32, 34–38 (Tex.Crim.App.1986). The *Bennett* opinion distinguished *Kolliner v. State,* 516 S.W.2d 671 (Tex.Crim.App.1974), on which appellant relies. 726 S.W.2d at 37–38. The court in *Bennett* held:

> Nor do we agree that by focusing the jury's consideration on the reasonable beliefs which might justify DeRoushia's conduct the court's instruction improperly limited appellant's right of self-defense. . . .
>
> [A]ppellant *was* in a position to recognize, at the time he acted, that the force being asserted against him, though perhaps deadly, was justifiable, and hence lawful. . . . Upon being turned around and facing DeRoushia's gun, appellant could reasonably have believed that deadly force . . . was being used justifiably to counter the deadly force he appeared to be asserting against Rattan. In such a case appellant's reciprocal use of deadly force against DeRoushia would not be justified, and it would be proper for the jury to reject his claim of self-defense.
>
> The jury was instructed that before it could discount appellant's self-defense

claim it must first find beyond a reasonable doubt ... whether DeRoushia was justified in using deadly force against appellant in defense of Rattan. In making this assessment the jury necessarily had to evaluate the reasonableness of DeRoushia's belief that appellant was using or attempting to use deadly force against Rattan and that the force he used to repel appellant's attack against Rattan was immediately necessary. *Thus it is true that in determining the lawfulness of DeRoushia's conduct the jury had to view the altercation from DeRoushia's standpoint, rather than appellant's.*

*Id.* at 37–38 (first emphasis in original; second emphasis added).

Appellant contends *Bennett* is distinguishable because, unlike the charge here, the charge in *Bennett* did not tell the jury to consider the reasonableness of the deceased's conduct "as viewed from [the deceased's] standpoint." It is true that those words were not included in the *Bennett* instruction. However, the *Bennett* instruction repeatedly told that jury to decide what the deceased, Mr. DeRoushia, "reasonably believed." From the italicized language quoted above in *Bennett*, we conclude that the Court of Criminal Appeals held that, in deciding what DeRoushia reasonably believed, "the jury had to view the altercation from DeRoushia's standpoint, rather than appellant's." If the jurors had to do that, it was not error for the trial judge to instruct them to do so. The fact that the *Bennett* instruction concerned defense of a third person, rather than self-defense, does not call for a different result.

Point of error nine is overruled.

The judgment is reversed, and the cause is remanded.

O'CONNOR, J., concurs.

O'CONNOR, Justice, concurring.

I disagree with part of the majority's resolution of points of error one and two, but agree with the remainder of the opinion.

This case requires us to distinguish between the sudden passion necessary to support an instruction on voluntary manslaughter from the fear that will support the instruction of self-defense.

The record in this case can support two completely different and conflicting versions of the events of the morning of October 31, 1989. The majority has fairly stated the facts that led up to and culminated in the shooting. I only summarize those facts.

The State's version of the events that morning and the previous night is that the appellant and two officers, who had spent most of the night drinking, were probably drunk as they were driving on the freeway about 5:00 a.m. That same morning, Ida Delaney, a grandmother, was driving her truck on the same freeway, on her way to work at the Houston Post, where she was due at 6:00 a.m. A few weeks before, she had purchased a gun because the parking lot at work was dark in the early morning, and the Houston Post did not have a security guard on duty. At some point, Delaney turned in front of the car with the officers, almost causing an accident. The officers became enraged and began harassing her by tailgating her vehicle and honking at her. Delaney, frightened by the car full of men behind her, drove toward the flashing lights of a Texas Highway Department truck parked on the side of the freeway. She pulled her truck in front of the highway department truck, backed to about four feet from it, got out, and started walking toward it. Seconds later, the car with the officers drove up, and the three men got out. One officer ran to the highway department truck, identified himself as a police officer, and asked the highway department employee to call the police, telling him that the driver of the truck had been shooting at them and was crazy. Meanwhile, the appellant went to the trunk of his car, got his service gun, and then ran toward the Delaney's truck shouting that

he was a police officer. Delaney retreated to her truck, got in, and tried to pull the door shut, but the appellant, standing in the way of the door, held a gun to her face and stopped her. Then, with his other fist, the appellant struck Delaney with a hard blow to the face. At the time she was struck, Delaney had not been doing anything, but immediately afterward she leaned over, got her gun, and shot the appellant. The appellant, wounded in the chest, exchanged fire with Delaney, and killed her.

The appellant's version of the incident is that, although the appellant and two officers had been drinking most of the night, they were not intoxicated or, if intoxicated, it did not affect the appellant's actions. The appellant contends that Delaney was not, as the State portrayed her, a harmless grandmother. Instead, she was a violent woman who had assaulted police officers, had shot and wounded her former husband, and stabbed someone else with an ice pick. As the appellant and the officers were driving to a restaurant about 5:00 a.m., a truck almost caused an accident, and after they honked, someone in the truck stuck their hand out the window and shot at them. The officers thought the driver of the truck was both dangerous and crazy, and they followed the truck. They did not know the driver was a woman. When Delaney pulled off the freeway in front of the Texas Highway Department truck, one of the officers ran to the truck, identified himself as a police officer, and asked the highway department employee to call the police, telling him that the driver of the truck had been shooting at them and was crazy. After the appellant got his gun from the trunk of his car, he ran toward the truck, yelling that he was a police officer. The door to the truck was open, and only when the appellant reached inside the truck to pull the driver out did he realize the driver was a woman. Delaney bit the appellant on the thumb, and when the appellant pulled back, she shot him. The appellant, wounded in the chest, saw that Delaney was about to shoot him again, and he ex-

changed shots with her. Delaney was killed, and the appellant was wounded.

There is a critical similarity in the two versions of the events that morning—even the State admits that one of the officers ran to the highway department truck before the appellant ran to Delaney's truck, and told the workers that Delaney had shot at the officers on the freeway. Thus, on this record, we must assume as uncontroverted that Delaney shot at the officers while she was in her truck, or at least all three officers believed she shot at them.

The critical difference in the two versions of the events that morning is that the State's witness contends that the appellant hit Delaney with his fist as she was sitting in her truck, and that it was only after he hit her that she leaned over to get her gun. The appellant contends that he did not hit her, that when she leaned over to the right (he thought she was leaning over to get her gun), he reached in to pull her out of the truck, she bit him on the thumb he pulled back, and then she shot him.

I would separate the facts into two separate time periods: the facts before Delaney shot the appellant and the facts after Delaney shot the appellant. If we narrow our scope to the time period that began when Delaney shot the appellant, I do not believe there is any evidence in this record that supports the instruction on voluntary manslaughter. If there is any support for that instruction, it is only in the events that led up to the shooting, not those that followed it.

### After Delaney shot the appellant

Appellant testified that when Delaney shot him, he was "hurt" and "stunned." As he fell to the ground, he saw Delaney get out of the truck to shoot him again. He testified, "That's when we both fired again." On cross-examination, when referring to the issue of intoxication, the prosecutor asked the appellant, "You had absolutely full use of your mental and physical faculties when all this happened?" The appellant replied he did.

No other evidence was offered by any witness that shows that the appellant was dominated by an uncontrollable passion after he was shot. The appellant shot Delaney as he fell to the ground, and she was getting out of her truck to shoot him again.

In *Daniels v. State*, 645 S.W.2d 459, 460 (Tex.Crim.App.1983), the court discussed the instructions of self-defense and voluntary manslaughter in a case in which the defendant asked for but was refused an instruction on voluntary manslaughter. Recall, in the case before us, the appellant wanted an instruction on self-defense and objected to the instruction on voluntary manslaughter. In *Daniels*, the defendant testified that the deceased threatened to kill him and had reached into his back pocket for what the defendant thought was a gun. The court said that a bare claim of fear of the attacker does not entitle the defendant to a charge of voluntary manslaughter. *Id.* at 460. The court went on to distinguish fear that rises to the level of terror, which may constitute sudden passion, *if* its cause would commonly produce a degree of terror "sufficient to render the mind incapable of cool reflection." *Id.*

In this case, as in *Daniels*, the appellant testified that he shot Delaney because he was afraid she would kill him. The difference between the two cases is that, in this case, the attacker had already shot the appellant, while in *Daniels* the defendant thought he was about to be shot. In this case, the appellant's fear of a second shot was well-founded.

The majority agrees with the State that being shot in the chest by another person at close range is an event that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, *naturally* rendering him incapable of cool reflection. By the majority's statement, any time any person is wounded by another and shoots in return, it will raise the issue of voluntary manslaughter. I disagree. Once Delaney shot the appellant and was about to shoot him again, only the issue of self-defense is raised. That evidence precludes the issue of voluntary manslaughter. The majority has not cited any case in which the instruction of voluntary manslaughter was held proper when a defendant fires only after being wounded in order to protect himself from another shot.

The majority also states that the appellant's erroneous belief that he had been shot four times further supports the conclusion that, during these events, he was incapable of cool reflection. After the appellant was shot once, I do not think the mistaken belief that he was hit by additional bullets was unreasonable under the circumstances. The appellant testified he was in shock, which is a natural emotion after being shot.

The majority also states that the appellant's act of emptying his gun, firing eight shots at Delaney at close range, could support the jury's conclusion that he was acting out of sudden passion rather than cool reflection, and cites *Havard v. State*, 800 S.W.2d 195, 217 (Tex.Crim.App.1989). In *Havard*, the defendant was in a hurt and enraged state of mind *before* the shooting.

This case is similar to *Acosta v. State*, 742 S.W.2d 287 (Tex.Crim.App.1986), another case in which the trial court charged the jury on murder, the lesser included offense of voluntary manslaughter (over the defendant's objection), and self-defense. In *Acosta*, the defendant was about to be attacked by a man with a knife when he pulled his own knife and killed his attacker. *Id.* at 288. The court held there was no evidence to support the submission of the issue of voluntary manslaughter, and the court should not have submitted it as a lesser included offense to murder. Finding no evidence of sudden passion to support the submission, the court reversed and remanded with instructions for acquittal. *Id.; see also Bradley v. State*, 688 S.W.2d 847, 852 (Tex.Crim.App.1985) (the court acquitted the defendant because the jury was instructed on murder, the lesser included offense of voluntary manslaughter, and self-defense, and the defendant had proper-

ly objected to the submission of voluntary manslaughter).

The facts in this case are close to those in another case by the same name, *Gonzales v. State*, 717 S.W.2d 355 (Tex.Crim. App.1986). The difference, however, is that the defendant in that case requested but was denied the charge of voluntary manslaughter; the appellant in this case objected to the charge and it was submitted over his objection. In *Gonzales*, after a confrontation in a night club with the victim, a friend of the defendant's, the defendant went to his friend's car to wait for him. The defendant then saw the victim come out of the club and take something out of the trunk of his car. The defendant picked up his friend's gun and got out of the car and walked away. The victim came up behind the defendant and fired a shot at him. The defendant then turned around and shot the victim, killing him. In *Gonzales*, the court said that fear alone was not enough to justify the submission of the charge of voluntary manslaughter. *Id.* at 357. Similarly in this case, the fear to which the appellant testified was not enough to justify the submission. In *Gonzales*, the court said that the defendant only indicated he was afraid of the victim, which did not amount to terror that would qualify as a sudden passion. *Id.*

I conclude that there was no evidence of sudden passion to support the submission of voluntary manslaughter if we limit our review to the facts after Delaney shot the appellant. The only evidence to support the submission of the instruction on voluntary manslaughter occurred before Delaney shot the appellant, as set out in the majority's opinion.