940 A.2d 269

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
GEORGE JENEWICZ, DEFENDANT–APPELLANT.

Argued September 11, 2007—Decided January 28, 2008.

441

442

444

*Daniel V. Gautieri,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Nancy A. Hulett,* Assistant Prosecutor, argued the cause for respondent (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney).

PER CURIAM.

Eunice Gillens was fatally shot in the chest by her live-in boyfriend, defendant George Jenewicz. Jenewicz admitted that he shot Gillens, but claimed that he acted in self-defense. At his trial, Jenewicz testified to the violence that existed in their home and, in particular, about Gillens's rages and physical violence toward him, in order to explain his actions when Gillens was shot. However, Jenewicz's credibility was subjected to serious attack at trial. And, although a female acquaintance of the two also testi-

fied to Gillens's violence and her eccentric paranoid behaviors, that witness's credibility likewise was impeached.

The jury convicted Jenewicz of first-degree murder, in violation of *N.J.S.A.* 2C:11–3, and possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4(a).[1] The Appellate Division affirmed all convictions. Defendant petitioned for certification alleging several trial errors. We granted certification to review three, which involved the preclusion of testimony from two defense witnesses, and a claim that the prosecution engaged in improper cross-examination of the defense's expert witness and disparaged the expert, as well as the defense, during summation. *State v. Jenewicz*, 189 *N.J.* 103, 912 *A.*2d 1263 (2006).

We now consider whether the errors that defendant alleges to have occurred during his trial, individually or in the aggregate, deprived defendant of a fair trial in which he fairly could present his defense. Viewing the errors found in defendant's trial through the prism of how they affected his ability to have the jury fairly consider his claim of self-defense, we conclude that the cumulative impact of the errors casts doubt on the fairness of defendant's trial and on the propriety of the jury verdict that was the product of that trial. We therefore are compelled to reverse defendant's murder and weapon possession convictions and to remand for a new trial on those charges. *See State v. Blakney*, 189 *N.J.* 88, 97, 912 *A.*2d 140 (2006); *State v. Reddish*, 181 *N.J.* 553, 616, 859 *A.*2d 1173 (2004).

## I.

All charges against Jenewicz arose in connection with the October 22, 1998, shooting death of Gillens.[2] At trial, Jenewicz

---

[1] The jury also convicted defendant of third-degree hindering apprehension or prosecution, in violation of *N.J.S.A.* 2C:29–3(b). For that, defendant was sentenced to five years imprisonment with a parole disqualifier of two-and-one-half years. Our grant of certification does not involve the hindering conviction.

[2] As noted, Jenewicz admitted to shooting Gillens, but claimed that he acted in self-defense. In light of his defense to the murder and related weapon posses-

described generally his relationship with Gillens and specifically the circumstances that arose on the day of the shooting. The two began living together in May 1998, when Gillens moved in with Jenewicz. They had met in February 1998, when both were participants in an out-patient rehabilitation program for substance abusers. By July 1998, the relationship had deteriorated. Their life together was marred by their common problem with substance abuse. Jenewicz predominantly abused alcohol. Gillens predominantly took cocaine. Their substance dependence, and the issues that flowed therefrom, led to monumental battles between the two.

Gillens was a heavy cocaine user. Jenewicz was footing the bill for Gillens's cocaine supply out of an inheritance that he had received. Her addiction to the drug and the amount of money that she spent to satisfy her habit fueled many of the couples arguments, which often escalated into episodes of rage, personal violence, and property damage by Gillens. She would scratch, bite, and kick Jenewicz during arguments. She also would destroy furniture as well as other household property during her rages. Following one such argument, Gillens pursued Jenewicz through their home armed with one of Jenewicz's shotguns. Her pursuit of him ended only when the shotgun's muzzle caught in a banister spoke on the staircase, causing her to trip and injure her right arm. That shotgun was not the only weapon kept in the residence. Jenewicz legally owned two shotguns, a rifle, and a handgun.

Jenewicz described a household that was filled with tension. He testified that, over the course of their few months of cohabitation, Gillens became paranoid and would sleep with a hammer nearby. She kept the curtains drawn because she was fearful that she was being watched and always locked the doors, often propping chairs or bowling balls against the doorframes for good measure. Gillens

---

sion charge, we set forth the relevant facts as presented by Jenewicz to give context to his argument about the impact of the alleged trial errors.

also took to carrying Jenewicz's shotgun around the house and scattering ammunition throughout different rooms.

On the day of the shooting, Jenewicz and Gillens had an argument in the upstairs master bedroom because Jenewicz spent the couple's available money to buy alcohol, instead of the cocaine that Gillens wanted. Jenewicz walked out of their bedroom while Gillens continued to shout at him, only to return to the room a short time later. He testified that, as he entered, Gillens jumped from the bed and reached for a nearby shotgun. Jenewicz claimed that, in reaction, he reached for a handgun in a dresser and shot Gillens once in the chest. The wound proved fatal.

Rather than notifying the police of the shooting, Jenewicz spackled over the bullet hole in the bedroom wall and carried Gillens's body to the basement of their residence. A few days later, Jenewicz dismembered her body, depositing Gillens's arms in a nearby field and boiling Gillens's head to destroy her facial features. Jenewicz then telephoned a friend for aid in the disposal of the remainder of Gillens's body, which Jenewicz had wrapped in plastic. Jenewicz's friend instead informed the police of Jenewicz's intent. Police officers thereupon proceeded to Jenewicz's residence and arrested him.[3]

At trial, Jenewicz's testimony about Gillens's paranoia and violent conduct was corroborated by Zoromae Glenngrant, an acquaintance who also happened to have been Gillens's drug supplier. Although Glenngrant testified to numerous instances of Gillens's violent outbursts that she had observed, Glenngrant's testimony was undermined by a cross-examination that harped on her nefarious occupation as a drug dealer.

Jenewicz's self-defense argument depended therefore on additional support in the form of expert testimony from Dr. Chester Trent. Dr. Trent's testimony was to address Gillens's behaviors

---

[3] As noted earlier, Jenewicz was convicted of hindering apprehension or prosecution based on his post-shooting conduct and the validity of that conviction is not under review in this appeal. *See supra* at note 1.

in the home that she shared with Jenewicz, and to opine that that behavior was consistent with that of an addict subject to cocaine rages. Jenewicz also intended to produce testimony from Gillens's mother, Lillie Tankard, about Gillens's violence toward Jenewicz. Finally, he intended to call John Kelly as an expert in the behavioral characteristics of long-term cocaine abusers. The trial court precluded the proposed testimony of Tankard and Kelly. Defendant's appeal concerns the preclusion of those two witnesses and asserts additional errors in respect of the prosecutor's cross-examination of Dr. Trent and in the summation that discussed Dr. Trent's testimony and the defense.

## II.

New Jersey's Code of Criminal Justice shields a defendant from criminal liability when the defendant is found to have acted in self-defense. *See State v. Kelly*, 97 *N.J.* 178, 197–98, 478 *A.*2d 364 (1984). The legal justification for the protection of one's person is codified at *N.J.S.A.* 2C:3–4(a), which states that

[s]ubject to the provisions of this section and of section 2C:3–9, the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

When deadly force is used, the justification of self-defense exculpates a defendant when he "reasonably believes that such force is necessary to protect himself against death or serious bodily harm." *N.J.S.A.* 2C:3–4(b)(2). A self-defense claim therefore requires a jury (1) to discern whether the defendant had a subjective belief at the time that deadly force was necessary and then (2) to determine whether that subjective belief was objectively reasonable.[4] *See State v. Williams*, 168 *N.J.* 323, 332–33, 774 *A.*2d 457 (2001); *Kelly, supra,* 97 *N.J.* at 199–200, 478 *A.*2d 364.

---

[4] After a defendant raises a claim of self-defense, the burden of proof shifts to the State to disprove the defense beyond a reasonable doubt. *See State v. Perry,* 124 *N.J.* 128, 194, 590 *A.*2d 624 (1991); *State v. Abbott,* 36 *N.J.* 63, 72, 174 *A.*2d 881 (1961).

A defendant's state of mind at the time of an alleged crime is inherently intangible and, therefore, is proven predominantly through witness testimony and circumstantial evidence. *See State v. Williams*, 190 *N.J.* 114, 124, 919 *A.*2d 90 (2007) (recognizing difficulty of proving mental state through direct evidence). An obvious, ready source of direct evidence about state of mind is the defendant's testimony. Such testimony is vulnerable, however, to impeachment for bias, which would be expected to lessen its value in the eyes of jurors. Therefore, when a defendant's defense to a murder charge rests on self-defense, as in the case here, presentation of other evidence addressing the objective reasonableness of a defendant's subjective perception of mortal danger becomes crucial to the defense and to the jury's truth-seeking function. *See Washington v. Texas*, 388 *U.S.* 14, 19, 87 *S.Ct.* 1920, 1923, 18 *L.Ed.*2d 1019, 1023 (1967).

A defendant enjoys a fundamental constitutional right to a fair trial, which necessarily includes the right to present witnesses and evidence in his own defense. *See ibid.* ("The right to offer the testimony of witnesses ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."). In this state, the fundamental right of an accused to present a defense is protected not only by the Federal Constitution but also by Article 1, paragraph 1 of the New Jersey Constitution. *See State v. Feaster*, 184 *N.J.* 235, 250, 877 *A.*2d 229 (2005); *see also Chambers v. Mississippi*, 410 *U.S.* 284, 302, 93 *S.Ct.* 1038, 1049, 35 *L.Ed.*2d 297, 312 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). Although fundamental, a defendant's right to present a defense is not absolute. *See Montana v. Egelhoff*, 518 *U.S.* 37, 42, 116 *S.Ct.* 2013, 2017, 135 *L.Ed.*2d 361, 367 (1996) (" 'The accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.' " (quoting *Taylor v. Illinois*, 484 *U.S.* 400, 410, 108 *S.Ct.* 646, 653, 98 *L.Ed.*2d 798, 811, *reh'g*

*denied,* 485 *U.S.* 983, 108 *S.Ct.* 1283, 99 *L.Ed.*2d 494 (1988) (alteration in original))).

With those principles as our guide, we turn to the errors that Jenewicz claims prevented him from obtaining a fair trial. We consider first the evidence that defendant was unable to present in his trial.

## III.

### A.

■ Defendant advances a single argument in respect of the preclusion of John Kelly's testimony: whether the trial court should have qualified Kelly to offer expert testimony about the behavioral aspects and mental irregularities caused by long-term cocaine abuse. In a written report based on his knowledge of the common characteristics of long-term cocaine users, Kelly stated that Gillens's severe paranoia, intense anger, explosive rage, and violence were all symptomatic of severe cocaine dependency. He therefore opined that Gillens was a cocaine abuser. The defense intended for Kelly's testimony to support Jenewicz's claim of self-defense by bolstering the testimony of Jenewicz, Glenngrant, and Dr. Trent. The trial court conducted a *Rule* 104 hearing that elicited the following information about Kelly's qualifications.[5]

Kelly, a rehabilitated cocaine addict himself, testified that he is a certified drug counselor. In the hearing, Kelly mapped out his experiences in substance abuse education and counseling. After initially volunteering at the Raritan Bay Medical Center, he was

---

[5] *Rule* 104(a) hearings are held to inform those determinations reserved for trial judges. The *Rule* states:

> When the qualification of a person to be a witness, or the admissibility of evidence, or the existence of a privilege is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge. In making that determination the judge shall not apply the rules of evidence except for Rule 403 or a valid claim of privilege. The judge may hear and determine such matters out of the presence or hearing of the jury.

hired to work as a "cocaine-addiction specialist." In that capacity, Kelly was responsible for educating hospital personnel in certain departments about cocaine-related facts and symptoms. He also received counseling assignments for addicts involved with the hospital's out-patient program. Eventually, Kelly achieved the title of "senior counselor," which placed him in charge of other counselors in the program and required him to participate in community outreach programs, in which he would speak at different venues about "the dangers of cocaine in the community." At present, Kelly manages an out-patient counseling agency that predominantly focuses upon addictive illness. He evaluates and develops treatment plans, in conjunction with a psychologist, for drug abusers seeking rehabilitation. Over the years, Kelly has evaluated over one thousand individuals addicted to cocaine.

Kelly is certified by the State for social work, specializing in substance abuse. That said, he is neither a licensed clinical social worker nor a licensed social worker. *See N.J.S.A.* 45:15BB–6. He also possesses a national certification as an "addiction specialist." The American Forensic Board certified Kelly as a "forensic examiner," which purports to authorize him to give an expert opinion regarding substance abuse. Kelly acknowledged, however, that he never before was qualified as an expert to offer an opinion about an individual whom he had not examined, as he was asked to do in this case. Finally, although he was familiar with the Diagnostic and Statistical Manual of Mental Disorders (DSM), Kelly conceded that he does not have the proper clinical background to determine an individual's DSM classification.

The *Rule* 104 hearing further revealed that Kelly met with Jenewicz at least three times at the Middlesex County Workhouse prior to the trial. The sessions' durations ranged from thirty minutes to one-and-one-half hours. Kelly based his opinions about Gillens on Jenewicz's statements during the sessions about his relationship with Gillens as well as other discovery information, including medical and police reports, and witnesses' statements.

Jenewicz was the only individual whom Kelly personally interviewed.

At the conclusion of the 104 hearing, the court determined that Kelly did not possess the requisite qualifications to testify to the conclusions contained in his written report. The court found Kelly's expertise to be in the evaluation of individuals for purposes of developing appropriate treatment modalities, and not in the diagnosis of cocaine addiction, because he lacked the requisite clinical background to testify to the behavioral and mental irregularities of long-term cocaine abusers.

As the trial court recognized, the admissibility of expert testimony is governed by *N.J.R.E.* 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The *Rule* has three requirements for the admission of expert testimony: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony. *See Kelly, supra,* 97 *N.J.* at 208, 478 *A.*2d 364; *see also State v. Townsend,* 186 *N.J.* 473, 491, 897 *A.*2d 316 (2006) (same). Those requirements are construed liberally in light of *Rule* 702's tilt in favor of the admissibility of expert testimony. *See State v. Berry,* 140 *N.J.* 280, 290–93, 658 *A.*2d 702 (1995).

In respect of prong (3)—the individual's expertise to speak on a topic as an expert witness—our trial courts take a liberal approach when assessing a person's qualifications. Our case law is replete with examples of the generous approach taken by our courts when qualifying experts based on training and experience. *See, e.g., State v. Moore,* 122 *N.J.* 420, 457–60, 585 *A.*2d 864 (1991) (holding that trial court did not err in qualifying individual, with more than two years of experience as crime scene investigator but

only two days of experience analyzing blood-spatter, to testify as blood-spatter expert); *State v. Krivacska,* 341 *N.J.Super.* 1, 32–33, 775 *A.*2d 6 (App.Div.) (permitting psychologist to offer expert opinion about mentally handicapped individual notwithstanding that he did not specialize in evaluating mentally handicapped patients and had no experience with victim's particular cognitive impairment), *certif. denied,* 170 *N.J.* 206, 785 *A.*2d 435 (2001), *cert. denied,* 535 *U.S.* 1012, 122 *S.Ct.* 1594, 152 *L.Ed.*2d 510 (2002); *see also State v. Bealor,* 187 *N.J.* 574, 592–93, 902 *A.*2d 226 (2006) (recognizing that police officers generally are qualified to offer expert testimony on marijuana intoxication based upon basic pre-commission training).

As can be observed from the examples cited, courts allow the thinness and other vulnerabilities in an expert's background to be explored in cross-examination and avoid using such weaknesses as a reason to exclude a party's choice of expert witness to advance a claim or defense. That the strength of an individual's qualifications may be undermined through cross-examination is not a sound basis for precluding an expert from testifying as part of a defendant's defense, even if it likely will affect the weight that the jury will give the opinion. Rather, a court should simply be satisfied that the expert has a basis in knowledge, skill, education, training, or experience to be able to form an opinion that can aid the jury on a subject that is beyond its ken. *See Kelly, supra,* 97 *N.J.* at 208, 478 *A.*2d 364. We allow substantial deference to the trial court when it determines whether to qualify a proposed expert. A court's witness-qualification decision is subject to essentially an abuse-of-discretion standard of review and will only be reversed for "manifest error and injustice." *State v. Torres,* 183 *N.J.* 554, 572, 579, 874 *A.*2d 1084 (2005) (quoting *State v. Ravenell,* 43 *N.J.* 171, 182, 203 *A.*2d 13 (1964), *cert. denied,* 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965) (internal quotation marks omitted)).

Mindful of Kelly's significant experience working with cocaine addicts and his teaching others how to recognize symptoms of

cocaine addiction, and based on the fundamental notion that the evaluation of treatment modalities for cocaine addicts requires an understanding of the behavioral aspects associated with cocaine abuse, we are compelled to conclude that the trial court erred in precluding Kelly's testimony. Indeed, to its credit, the State concedes on appeal that the preclusion of Kelly's testimony was error and argues only that the error was harmless.

*Evidence Rule* 702's liberal approach favoring admissibility, *see Berry, supra,* 140 *N.J.* at 290–93, 658 *A.*2d 702, and the substantial liberty interest at stake for defendant tip the scales in favor of finding error in the trial court's preclusion of Kelly's testimony. We do not do so lightly, particularly in light of the abuse-of-discretion standard that we apply to a trial court's evidentiary rulings under *Rule* 702. That said, we ordinarily would not find this error standing alone to rise to the magnitude of reversible error; nor will we view it in isolation and accept that it was harmless, as the State argues. Rather, we will consider its contribution to defendant's claim of cumulative error.

### B.

Jenewicz also sought to produce testimony from Gillens's mother, Lillie Tankard. The trial court engaged in a colloquy with counsel outside the presence of the jury to hear the purposes for which Tankard's testimony would be offered and to determine whether that testimony was admissible under the New Jersey Rules of Evidence.

In respect of the contents of what the defense hoped to obtain from Tankard's testimony, defense counsel had only Tankard's unsworn statements to the police with which to work.[6] In those statements, Tankard recounted that Gillens had told her about two prior violent incidents between Gillens and Jenewicz. In the first, to which Jenewicz and Glenngrant also testified, a shotgun-toting

---

[6] Our review of this proffered testimony is based on those unsworn statements. It is unclear how Tankard would testify on the stand.

Gillens pursued Jenewicz through their home in the wake of an argument with him, and had her pursuit impeded only because she tripped when the gun's muzzle caught in the staircase's banister. In the second incident described by Tankard, Gillens kicked Jenewicz down the same staircase because he had tied her up. Gillens told Tankard that she thought at the time that Jenewicz had died from the fall.

At the conclusion of the colloquy, the trial court held that Tankard's testimony about prior instances of Gillens's conduct was inadmissible. The court reasoned that although evidence of the victim's propensity for violence is admissible when the defendant claims self-defense, *Rule* 405 precludes admission of prior instances of the victim's violent conduct to show the victim's propensity for violence. We now review defendant's argument that his assertion of self-defense put Gillens's character for violence in issue and permitted introduction of prior specific incidents of her conduct.

1.

In self-defense cases, evidence of the victim's violent character serves two general purposes: (1) it demonstrates the victim's propensity for violence, which tends to support an inference that the victim was the initial aggressor; and (2) where the accused has knowledge of the victim's prior violent acts, it tends to show the reasonableness of the accused's belief that the use of self-defense against the victim was necessary.

We dispense quickly with review of the trial court's handling of Tankard's proposed testimony about the incident in which Gillens kicked Jenewicz down a staircase after Jenewicz had tied Gillens up. That proffered evidence does not meet the liberal definition of "relevant evidence." *Evidence Rule* 401 defines "relevant evidence" as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." Analyzing relevance requires examining "the logical connection between the proffered evidence and a fact in issue."

*Williams, supra,* 190 *N.J.* at 123, 919 *A.*2d 90 (quoting *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 15, 860 *A.*2d 435 (2004) (internal quotation marks omitted)). Although the inquiry has been labeled as "generous," *ibid.* (citing *State v. Davis,* 96 *N.J.* 611, 619, 477 *A.*2d 308 (1984)), the testimony proffered here supported that Jenewicz was the initial physical aggressor in that incident. The testimony is not probative on the factual dispute about whether Gillens was the initial aggressor on the date of the shooting. The testimony also is not relevant to support the reasonableness of Jenewicz's belief in the need to use self-defense on the date of the shooting. Jenewicz cannot claim to have formed a reasonable belief about the need to use self-defense against Gillens based upon an incident in which Jenewicz initiated the physical violence between them. We conclude that the trial court committed no error in excluding Tankard's proffered testimony about that second incident.

Turning back to the first incident described in Tankard's statement, we reach a different conclusion about the relevancy of that evidence. Tankard's testimony that Gillens told her that she pursued Jenewicz with a shotgun after a verbal confrontation would be relevant to show both that Gillens's violent character makes it more likely that she was the initial aggressor on the date of the shooting, and the reasonableness of Jenewicz's belief in the need to use self-defense. Therefore, we turn to review the trial court's reason for excluding that evidence.

### 2.

The trial court labeled Tankard's testimony as character evidence based on prior acts that concerned Gillens's conduct. Evidence Rules 404 (a) and (c), which generally govern the admissibility of character evidence tending to prove an individual's propensity to act in conformity with a character trait, provide:

> (a) Character evidence generally. Evidence of a person's character or character trait, including a trait of care or skill or lack thereof, is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except:

. . . .

(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

. . . .

(c) Character and character trait in issue. Evidence of a person's character or trait of character is admissible when that character or trait is an element of a claim or defense.

When, as here, a defendant accused of murder asserts self-defense, he can adduce evidence of the victim's violent character for the purpose of proving that the victim's character for violence tends to show that the victim was the initial aggressor. *See State v. Aguiar*, 322 *N.J.Super.* 175, 182–84, 730 *A.2d* 463 (App.Div. 1999); *see also N.J.R.E.* 404(a)(2). That the character evidence can be produced to prove a victim's propensity for violence does not end the admissibility inquiry, however.

▮▮▮▮ *Rule* 405 limits the form in which character evidence may be presented. It provides:

(a) Reputation, opinion, or conviction of crime. When evidence of character or a trait of character of a person is admissible, it may be proved by evidence of reputation, evidence in the form of opinion, or evidence of conviction of a crime which tends to prove the trait. Specific instances of conduct not the subject of a conviction of a crime shall be inadmissible.

(b) Specific instances of conduct. When character or a trait of character of a person is an essential element of a charge, claim, or defense, evidence of specific instances of conduct may also be admitted.

Specific instances of conduct not amounting to prior criminal convictions are not admissible unless a trait of character is an essential element to a claim or defense. *N.J.R.E.* 405; *see also State v. Mahoney*, 188 *N.J.* 359, 372, 908 *A.2d* 162, *cert. denied,* —— *U.S.* ——, 127 *S.Ct.* 507, 166 *L.Ed.2d* 368 (2006). Here, Tankard's testimony was proffered on a prior instance of conduct not amounting to a conviction. Her testimony would be admissible for the purpose of proving Gillens's propensity for violence only if Gillens's violent character is an essential element of Jenewicz's claim of self-defense, a question that our courts have not addressed squarely.

Under *Evidence Rules* 46 and 47, the precursors to *Rule* 405, our courts "generally prohibited admission of specific instances of misconduct to establish the turbulent character of the deceased where the deceased's conduct was in issue." *State v. Pratt,* 226 *N.J.Super.* 307, 322, 544 *A.*2d 392 (App.Div.), *certif. denied,* 114 *N.J.* 314, 554 *A.*2d 864 (1988). Indeed, in *State v. Conyers,* 58 *N.J.* 123, 133, 275 *A.*2d 721 (1971), this Court affirmed the exclusion of evidence of a victim's specific prior conduct notwithstanding that it tended to support the conclusion that the victim was acting aggressively at the time the victim was shot.

Other jurisdictions are in conflict over whether a victim's character trait for violence is an essential element of a claim of self-defense. In *United States v. Keiser,* 57 *F.*3d 847, 856 (9th Cir.), *cert. denied,* 516 *U.S.* 1029, 116 *S.Ct.* 676, 133 *L.Ed.*2d 525 (1995), the Ninth Circuit Court of Appeals explained that a character trait is an essential element of a claim or defense only when "proof, or failure of proof, of the character trait by itself actually satisf[ies] an element of the charge, claim, or defense." The *Keiser* court held that the victim's violent character is not an essential element of self-defense because it is not determinative of the success of the defense. *Id.* at 857.

> Even had [the accused] proven that [the victim] is a violent person, the jury would still have been free to decide that [the victim] was not using or about to use unlawful force, or that the force [the victim] was using was not likely to cause death or great bodily harm, or that [the accused] did not reasonably believe force was necessary, or that he used more force than appeared reasonably necessary. On the other hand, a successful defense in no way depended on [the accused] being able to show that [the victim] has a propensity toward violence. A defendant could, for example, successfully assert a claim of self-defense against an avowed pacifist, so long as the jury agrees that the defendant reasonably believed unlawful force was about to be used against him. Thus, even though relevant, [the victim's] character is not an essential element of [the accused's] defense.
>
> [*Ibid.*]

Some state courts have decided the issue consistent with the analysis enunciated well in *Keiser. See, e.g., State v. Williams,* 141 *Ariz.* 127, 685 *P.*2d 764, 766 (Ct.App.1984) (holding that victim's violent character was not essential element of self-defense because it was not "an operative fact which, under substantive law,

determines the rights and liabilities of the parties"); *State v. Bland,* 337 *N.W.*2d 378, 382 (Minn.1983) ("[E]vidence of a specific act of violence is not admissible to prove who was the aggressor."); *see also McClellan v. State,* 264 *Ark.* 223, 570 *S.W.*2d 278, 280 (1978) (concluding that victim's propensity for violence was "obviously" not an essential element of self-defense because "[o]ne might plead self-defense after having killed the most gentle soul who ever lived"); *State v. Alexander,* 52 *Wash.App.* 897, 765 *P.*2d 321, 324 (1988) ("The self-defense issue could be resolved without any evidence of, or reliance upon, a character trait of [the victim] or the defendant.").

Others have reached a contrary conclusion. In *State v. Lewchuk,* 4 *Neb.App.* 165, 539 *N.W.*2d 847, 853–54 (1995), for example, the Nebraska Court of Appeals permitted a defendant to offer testimony of the victim's violent conduct, of which the defendant was unaware, to show that the victim's propensity for violence made it more likely that the victim was the initial aggressor. The court held that the victim's violent character was an essential element of the self-defense claim because "testimony about specific incidents of the victim's violent behavior was relevant to, and probative of, the question of who was the first aggressor." *Ibid.*; see also *State v. Dunson,* 433 *N.W.*2d 676, 680–81 (Iowa 1988) (holding that specific instances of conduct, occurring subsequent to assault for which defendant was charged, were admissible to show victim's propensity for violence in support of defendant's self-defense claim); *Gonzales v. State,* 838 *S.W.*2d 848, 859 (Tex.App. 1992) (concluding that evidence of victim's aggressive character is essential element of self-defense because definition of "in issue" shared same meaning as "consequential fact").

The better view is that a victim's violent character is not an essential element of self-defense. An "essential element" for purposes of New Jersey *Evidence Rule* 405, extends only to those elements that a party must prove or disprove to make out a prima facie case for a claim or defense. An accused can assert self-defense successfully without offering any evidence regarding a

victim's character. Therefore, character evidence cannot be regarded as "essential." In our view, those courts that have arrived at a contrary holding have founded their decisions on the fact that a victim's character for violence is "relevant," "probative," or "consequential" to the accused's theory of self-defense. *Rule* 405 imposes a stricter standard.

Moreover, the official comment accompanying *Rule* 404 buttresses that conclusion. The comment states that section (a) of the *Rule* generally follows, and is "almost identical" to, *Federal Rule* 404(a). *N.J.R.E.* 404(a) official comment. The Advisory Committee notes to *Federal Rule* 404 explain that, in self-defense cases, pertinent character evidence is admissible "subject to the limitations on form provided by Rule 405." *Fed.R.Evid.* 404 advisory committee's notes. *Rule* 405 does not set limitations on form when presenting evidence of character traits that are essential elements of claims or defenses.

In conclusion then, Jenewicz cannot offer Tankard's testimony about Gillens pursuing Jenewicz with a shotgun for the purpose of showing that, on the date of the shooting, Gillens acted in conformity with her violent character, making it more likely that Gillens was the initial aggressor.

### 3.

The last part to the analysis of Tankard's testimony must address whether Jenewicz should have been permitted to produce Tankard's testimony as buttressing evidence of his reasonable belief in the need to use deadly force to defend himself from Gillens at the time of the shooting.

*N.J.S.A.* 2C:3–4(b)(2) justifies the use of deadly force only when the actor reasonably believes that such force is necessary to protect the actor against death or serious bodily injury. *Evidence Rule* 404(b) permits defendants alleging self-defense to produce prior-acts evidence that speaks to the issue of the reasonableness of the defendant's belief that deadly force was necessary. The *Rule* states that "[s]uch evidence may be admitted for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *Ibid.* Only when the defendant has actual knowledge of the specific acts to which a witness testifies is specific-acts testimony probative of the defendant's reasonable belief. *See State v. Gartland,* 149 *N.J.* 456, 473, 694 *A.2d* 564 (1997) ("Our courts have always admitted evidence of a victim's violent character as relevant to a claim of self-defense so long as the defendant had knowledge of the dangerous and violent character of the victim." (citing *State v. Carter,* 278 *N.J.Super.* 629, 632, 651 *A.2d* 1088 (Law Div.1994))).

Plainly, Jenewicz had knowledge of the incident in which Gillens chased him with a shotgun. Although Jenewicz could not testify that he saw Gillens chasing him with a shotgun, Jenewicz testified that (1) he and Gillens had just argued; (2) Gillens followed him after he ran upstairs; (3) he heard a loud noise on the staircase; and (4) he went to the staircase where he saw the broken shotgun and Gillens with an injured right arm. Jenewicz's testimony demonstrated sufficient knowledge of Gillens's behavior during the incident to permit Tankard's testimony concerning the incident under *Rule* 404(b). Therefore, Tankard's testimony should have been permitted, with a proper limiting instruction, because it was probative of the reasonableness of Jenewicz's belief in the need to use self-defense against Gillens on the day of the shooting. That the testimony would have come from the victim's mother made this evidence of powerful importance to Jenewicz's claim of self-defense. We hold that it was error for the court to have prevented Jenewicz from presenting Tankard as a witness for the purpose of testifying on this limited incident.[7] We need not decide wheth-

---

[7] If Tankard's trial testimony were in accord with the statements to the police, the determination of whether Tankard's statements to the police are hearsay becomes moot. Tankard would testify to what Gillens said to her, not to what she told the police that Gillens said to her. Presumably the trial court would analyze the statement under the hearsay exception for statements against interest, *Rule* 803(c)(25). *See State v. Williams,* 169 *N.J.* 349, 360–63, 777 *A.2d* 919, (2001) (analyzing decedent's out-of-court statement that "[he] shot a kid," and

er, viewed in isolation, we would conclude that this error alone required reversal of defendant's conviction. Rather, we will assess the harm to defendant from this error by considering it in the context of the other errors in defendant's trial.

## IV.

As part of trial preparation, defense counsel had Dr. Trent, a psychiatrist, examine Jenewicz to determine whether a psychiatric basis existed upon which Jenewicz could plead either an insanity defense or a diminished capacity defense. Dr. Trent interviewed Jenewicz on November 18, 1998 and December 3, 1998. He also reviewed Jenewicz's indictment, relevant medical records, police reports, financial records, police statements, and witness statements prior to formulating his opinions. He concluded that the evidence did not support a defense of insanity or a defense of diminished capacity.

However, Dr. Trent's evaluation of Jenewicz and his review of the aforementioned documents did lead him to form an opinion about Gillens's psychiatric state. The defense called Dr. Trent to testify solely to his three opinions about Gillens, as set forth in his direct testimony:

The first opinion was, "At the time of her death Eunice Nadine Joseph–Gillens was intoxicated with alcohol and was probably in an early state of withdrawal from the effects of cocaine."

The second opinion was, "Ms. Gillens was a chronic, heavy cocaine user and secondarily a user of alcohol. Documents in this case strongly support substance use and abuse and withdrawal states associated therewith caused Ms. Gillens to have violent, paranoid, threatening behavior."

"Psychiatrists understand substance abusers, especially those who use cocaine and to a lesser extent alcohol may be at higher risk for involvement in deadly interpersonal violence."

---

concluding that inculpatory statement fell within purview of Rule 803(25) hearsay exception). Gillens's statement constituted an admission of her possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4(a), and also could give rise to a charge for aggravated assault in violation of *N.J.S.A.* 2C:12–1(b)(1). Therefore, the statements were inculpatory on their face and against interest when made.

Dr. Trent further stated that he drew his opinions from medically based understandings of the general behavior of cocaine abusers and alcohol abusers.

A.

During an extensive cross-examination, the prosecutor probed the accuracy of Dr. Trent's opinions, and it is alleged that his treatment of Dr. Trent amounted to misconduct, that the trial court erred in overruling defendant's objections to the questioning, and/or that defendant's trial counsel was ineffective in not exerting better control of the cross-examination through timely and effective objections. In as summary a fashion as possible, we recite the problematic areas of the cross-examination as alleged by defendant.

The questioning established that Dr. Trent formulated opinions without considering Gillens's family, medical, or marital histories, or her educational and employment backgrounds, that his knowledge of Gillens was limited to the small window of time from when Gillens began cohabitating with Jenewicz until her death, and that his opinions were premised in part on statements Jenewicz made during his psychiatric evaluation. The prosecutor also asked Dr. Trent about the impact of certain discrepancies between the statements Jenewicz made to the police investigator and the statements Jenewicz made during his psychiatric evaluation. The purpose of that line of questions was to demonstrate that Dr. Trent's initial conclusions might rest on an unreliable foundation. The prosecutor next asked Dr. Trent about a statement Jenewicz made during the psychiatric interview in which he compared how Gillens looked after she had been shot to how a deer looks after being shot. Dr. Trent did not pursue Jenewicz's reason for making such a comparison and, therefore, the purpose of the prosecutor's question was to attack the credibility of Dr. Trent's opinions, drawn from a reliance on Jenewicz's statements.

Defense counsel objected to both lines of questioning on the bases that the cross-examination exceeded the scope of direct

examination and that the questions had become a vehicle to place extremely prejudicial information before the jury. The trial court ruled that defense counsel had opened the door to permit the prosecutor to reference Jenewicz's statements during the psychiatric interviews, that Dr. Trent relied on the statements in rendering his opinions, and therefore, that the State was entitled to cross-examine Dr. Trent about the bases for his opinions.

 The bases on which an expert relies when rendering an opinion are a valid subject of cross-examination. *See State v. Wakefield*, 190 *N.J.* 397, 451–52, 921 *A.*2d 954 (2007) (citing *State v. Martini*, 131 *N.J.* 176, 259, 619 *A.*2d 1208 (1993), *overruled on other grounds, State v. Fortin (Fortin II)*, 178 *N.J.* 540, 646, 843 *A.*2d 974 (2004)). Indeed, in *Johnson v. Salem Corp.*, 97 *N.J.* 78, 477 *A.*2d 1246 (1984), this Court applied former *Evidence Rule* 56(2), the precursor to *Rule* 702, in holding that "the weight to which an expert opinion is entitled can rise no higher than the facts and reasoning upon which that opinion is predicated." *Id.* at 91, 477 *A.*2d 1246 (quoting *N.J. Rules of Evidence* (Annot.1984), comment 7 to *Evidence Rule* 56, at 360 (internal quotation marks omitted)). Further on point is our holding in *Martini, supra*, where a defense expert testified to the defendant's mental state at the time the crimes had been committed. 131 *N.J.* at 261, 619 *A.*2d 1208. The expert relied in part on a personality test he had conducted. *Ibid.* During cross-examination, the prosecutor asked the expert how the defendant answered a number of the questions on the personality test. *Id.* at 261–63, 619 *A.*2d 1208. The prosecutor also asked the expert whether he thought the defendant was lying when the defendant stated, during the evaluation, that he did not remember what happened on the day of the crimes. *Id.* at 262, 619 *A.*2d 1208. The defendant claimed that the cross-examination was a means of placing "damaging testimony about [the] defendant's moral character" before the jury. *Id.* at 263, 619 *A.*2d 1208. We concluded that the line of questioning was permissible precisely because the expert relied upon the

defendant's answers to the personality test in arriving at his conclusions. *Id.* at 264, 619 *A.*2d 1208.

In light of the broad discretion afforded to trial courts in controlling cross-examination and our holding in *Martini*, we conclude that the trial court did not abuse its discretion in permitting the prosecutor to delve into the statements made by Jenewicz to Dr. Trent during Jenewicz's psychiatric evaluation. Dr. Trent admitted to relying on Jenewicz's statements in forming his opinion. For a lay jury to comprehend the intricacies and credibility of expert testimony, it is necessary to avoid shielding the bases of expert opinions from searching cross-examination.[8]

■ Dr. Trent also testified on cross-examination, over objection, that he was approached to evaluate the viability of an insanity defense or diminished capacity defense, and that he found that neither defense applied to Jenewicz. Cross-examination yielded the following brief exchange:

Q. Now, when you were engaged by Mr. Altman he engaged you I believe you said, if I'm wrong, tell me, he requested a psychiatric evaluation of Mr. Jenewicz to determine if there are any psychiatric issues which might be issues in his defense relating to the killing of his live-in girlfriend, am I correct?

A. Yes.

Q. Okay. And by "psychiatric issues" you mean the possible presence of insanity?

A. Correct.

Q. Okay.

A. Or diminished capacity.

---

[8] We find no need to comment extensively on Jenewicz's claims that (1) his statements to Dr. Trent during the interviews were protected by attorney-client privilege, such that the prosecutor's reference to those statements on cross-examination was impermissible; and that (2) he received ineffective assistance of counsel. As to the first claim, *State v. Guido*, 40 *N.J.* 191, 206–07, 191 *A.*2d 45 (1963), held that although the results attained by an expert's evaluation of a defendant for purposes of trial are protected by the attorney-client privilege, the privilege is waived upon calling the expert to testify. As to the second issue, we noted in *State v. Preciose*, 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992), that we follow "a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal." (citing *State v. Dixon*, 125 *N.J.* 223, 262, 593 *A.*2d 266 (1991)).

Q. Or diminished capacity. In lay terms insanity means the inability to distinguish between right and wrong, am I correct?

A. Yes.

Q. That defense you could not find, am I correct?

A. I could not find it.

We never have had to address whether an expert may be cross-examined on his conclusions that are not made the subject of direct examination. Very little authority could be found on this narrow issue.[9] That said, Dr. Trent's testimony was limited to opinions about Gillens. His failure to find that Jenewicz could state a mental health defense did not impact the substance of his opinions in respect of Gillens. Nor does the failure to find a mental health defense support a reasonable basis for attacking the credibility of his testimony. "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." *N.J.R.E.* 611(b); *see also State v. Petillo,* 61 *N.J.* 165, 169, 293 *A.*2d 649 (1972), *cert. denied,* 410 *U.S.* 945, 93 *S.Ct.* 1393, 35 *L.Ed.*2d 611 (1973).

We have no doubt that the questions about Dr. Trent's failure to discern a mental health defense improperly exceeded the scope of cross-examination. As such, it was impermissible, and prosecutors must be vigilant to avoid such errors. The impermissible reference was, however, but a fleeting error occurring during the course of an otherwise extensive and highly effective cross-examination. Therefore, we will proceed to assess other errors asserted by defendant to have occurred in his trial.

### B.

■ Defendant alleges further error by the prosecutor, occurring in the summation when the prosecutor commented upon Dr. Trent's testimony. He stated:

---

[9] *See Bonda v. Point Marion Ford Sales, Inc.,* 47 *Pa. D. & C.*4th 307, 313 (C.P. Allegheny 2000) (holding that cross-examination could not permissibly inquire into areas of expert's report that were not within scope of expert's direct evidence).

Having failed to extricate himself at that point, enters Dr. Trent. He took insanity for a test drive and it failed but not before the defendant availed himself of another opportunity to address this shooting and at that point he embellished his earlier version and said [Gillens] picked up a rifle.

Later in the summation, the prosecutor again addressed the insanity defense.

And then [Dr. Trent] said to you insanity doesn't exist in this case. The defendant is perfectly sane as I told you six weeks ago. Then I said to him, and diminished capacity, that means in lay terms the reduced ability to act purposely or knowingly. He said yes. I said that defense is unavailable in this case. And he agreed.... Dr. Trent told you he conducted a mental status examination and found the defendant to have a better memory than most people and above average intelligence.

The prosecutor then finally addressed the credibility of Dr. Trent's opinions regarding Gillens's mental state at the time of the shooting. Pointing out weaknesses in the completeness and reliability of the information that Dr. Trent used when formulating his opinions, the prosecutor proceeded to comment as follows:

I don't question Dr. Trent's experience or education as a psychiatrist but he erred when he crossed over the bridge from being an objective psychiatrist to a subjective advocate. It took him three hours, two interviews, to conclude conclusively, determine conclusively that this man is sane, not suffering from diminished capacity. He stayed in the case in his zeal to help him.

I'll show you four questions that a forensic psychiatrist would have asked and when you see these questions there's only two answers as to why Dr. Trent didn't ask him. One, it was an oversight, and in a murder case we ought not deal with oversights. Or, two, in his zeal to help him he didn't want to ask him these questions because he knew the answers would incriminate him even further.

And, after referencing highly probative forensic evidence adduced by the State,[10] the prosecutor concluded by stating,

I suggest to you that it is time to at long last enter this claim of self-defense, manufactured for the purpose and convenience of trial when nothing else existed,

---

10 The State produced the testimony of Dr. Geetha Ann Natarajan, the County Medical Examiner for the County of Middlesex. Dr. Natarajan testified that examination of Gillens's body revealed traces of soot and gunpowder stippling that indicated that the gunshot that killed Gillens was fired from only a few inches from her chest. That is highly probative evidence tending to refute Jenewicz's testimony that he shot Gillens from across the room. It also tends to devalue Jenewicz's credibility.

and to enter it in the same unmarked burial ground reserved for all of civilized society's discarded lies.

At the behest of defense counsel and after the prosecutor had concluded, the trial judge instructed the jury to avoid drawing any negative inferences from the prosecutor's "test drive" comment.

Jenewicz claims that the improper references prejudicially denigrated Dr. Trent and misled the jury by suggesting that the defense was a product of witness bias despite the fact that the prosecutor was aware that another witness, John Kelly, would have reached identical conclusions as those to which Dr. Trent testified. The State counters that the prosecutor's summation merely attacked the weaknesses and inconsistencies in Dr. Trent's testimony and that the bulk of the summation was devoted to discussing the inconsistencies in Jenewicz's testimony.[11]

As for the allegation of improper witness denigration, the most instructive precedent is our decision in *State v. Nelson,* 173 *N.J.* 417, 803 *A.*2d 1 (2002). In *Nelson,* the prosecutor, during the penalty phase of a capital case, suggested that both of the defendant's expert witnesses "went over the edge as a member of the defense team to help [the] defendant." *Id.* at 461, 803 *A.*2d 1 (emphasis omitted). One expert was accused of "wearing the same color jersey as the other people on [the defendant's] team." *Id.* at 462, 803 *A.*2d 1 (internal quotation marks omitted). To accentuate the impact of the alleged bias, the prosecutor stated the State's expert "did not consider himself a member of the prosecution team." *Id.* at 463, 803 *A.*2d 1 (internal quotation marks omitted).

In discussing the "fine line" at which prosecutorial zeal ripens into prosecutorial misconduct, we noted:

---

[11] Jenewicz also challenges the prosecutor's "test drive" comment as prejudicial. The trial judge gave an appropriate limiting instruction as to that improper comment, however. We presume then that the jury followed the court's instruction and, therefore, do not conclude from that sole statement that Jenewicz suffered any substantial prejudice creating reversible error.

Prosecutors are expected to make a vigorous and forceful closing argument to the jury, *State v. Rose*, 112 *N.J.* 454, 517 [548 *A.*2d 1058] (1988), and are afforded considerable leeway in that endeavor, *State v. Smith*, 167 *N.J.* 158, 177 [770 *A.*2d 255] (2001). Nevertheless, there is a fine "line that separates forceful from impermissible closing argument." *Rose, supra*, 112 *N.J.* at 518 [548 *A.*2d 1058]. Thus, a "prosecutor must refrain from improper methods that result in wrongful conviction, and is obligated to use legitimate means to bring about a just conviction." *Smith, supra*, 167 *N.J.* at 177 [770 *A.*2d 255].

[*Id.* at 460, 803 *A.*2d 1.]

We characterized "casting unjustified aspersions on the defense or defense counsel" as creating sufficient danger of prejudice to rise to the level of misconduct. *Id.* at 461, 803 *A.*2d 1 (citing *Smith, supra*, 167 *N.J.* at 177, 770 *A.*2d 255). We found that the prosecutor's references in *Nelson* were "clearly improper" and constituted reversible error. *Id.* at 462, 803 *A.*2d 1. The record failed to support the prosecutor's allegations that the expert testimony was contrived and that there was collusion between the experts and the defense. *Ibid.* The prosecutor's insinuation that the State's expert was above reproach exacerbated the unpalatable nature of the comments. *Ibid.*; see also *Rose, supra*, 112 *N.J.* at 518, 548 *A.*2d 1058 (finding misconduct where prosecutor had stated that defense doctors "were explained the law by the lawyers, as to what he's being charged with, what he faced and how he could beat the penalty that the law provides for him" (emphasis omitted)).

Here, the majority of the prosecutor's criticism concerning Dr. Trent's testimony, such as critiquing the reliance on Jenewicz's statements and the failure to interview individuals other than Jenewicz, was entirely appropriate. Such weaknesses in the supporting information obtained by an expert and used in reaching his conclusions are fair game in the crucible of a trial. We expect trial advocates to point out such reasons for disbelieving or discounting an expert's testimony.

However, when the prosecutor stated that Dr. Trent "crossed over the bridge from being an objective psychiatrist to a subjective advocate" out of a "zeal to help [Jenewicz]," it was the prosecutor who crossed the line of acceptability. Those state-

ments implied that Dr. Trent's testimony was manufactured out of empathy. While this may not be the equivalent of the insinuations of manufactured testimony based upon collusion that were involved in *Nelson* and *Rose*, we disapprove of the practice used here to discredit Dr. Trent. Although we could not say that, standing alone, this improper conduct would require reversal of defendant's convictions, its impact adds to the accumulation of prejudice, casting further doubt upon the fairness of defendant's trial.

## C.

Finally, Jenewicz claims that, in summation, the prosecutor knowingly misled the jury by making statements clearly contrary to the evidence. Specifically, he argues that the prosecutor improperly suggested that the defense was a product of witness bias despite the fact that the prosecutor was aware that another witness, John Kelly, would have reached identical conclusions as those to which Dr. Trent testified.

Prosecutorial misconduct has been found in cases when prosecutors make statements clearly contrary to evidence that was either included or excluded at trial. *See, e.g., State v. Sexton,* 311 *N.J.Super.* 70, 81, 709 *A.2d* 288 (App.Div.1998) (finding prosecutorial misconduct where prosecutor stated in summation that gun belonged to defendant, when prosecutor had actual knowledge or reason to know that that was not so), *aff'd,* 160 *N.J.* 93, 733 *A.2d* 1125 (1999); *State v. Ross,* 249 *N.J.Super.* 246, 250, 592 *A.2d* 291 (App.Div.1991) (concluding that prosecutor's reference to victim's naiveté and lack of motive constituted plain error because prosecution knew, based on excluded evidence, that victim previously had alleged sexual abuse); *see also Gall v. Parker,* 231 *F.*3d 265, 316 (6th Cir.2000) ("[T]he prosecutor's barrage against [the defendant's] insanity defense comprised largely 'foul blows' having little to do with cognizable facts or evidence."), *cert. denied,* 533 *U.S.* 941, 121 *S.Ct.* 2577, 150 *L.Ed.*2d 739 (2001); *People v. Rose,* 307 *A.D.*2d 270, 761 *N.Y.S.*2d 686, 688 (2003) (finding that prosecutor

improperly argued that defendant "invented" assertion that victim falsely accused him of another incident, when prosecutor knew that that statement was false). The prosecutor's statements here do not rise to that level.

The statements did not contradict directly any evidence either admitted or precluded from trial. Even if Kelly had been permitted to testify, his opinions would have been subject to the same foundational attacks as much of the criticism levied against Dr. Trent, save the insinuations of personal bias (Kelly was not part of the analysis of Jenewicz for a possible insanity or diminished capacity defense). Although the insinuations of personal bias against Dr. Trent were improper and contribute to our assessment of cumulative error in defendant's trial, we cannot conclude that the prosecution can fairly be said to have intentionally misled the jury when it attacked the foundations for Dr. Trent's opinions. The fact that Kelly would have testified to opinions similar to those testified to by Dr. Trent does not render the prosecutor's challenge to the bases for Dr. Trent's opinion an exercise in the knowing misleading of a jury.

## V.

When assessing whether defendant has received a fair trial, we must consider the impact of trial error on defendant's ability fairly to present his defense, and not just excuse error because of the strength of the State's case. We have recognized in the past that even when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal. *See, e.g., State v. Koskovich*, 168 *N.J.* 448, 540, 776 *A*.2d 144 (2001) (holding that cumulative error warranted reversal of death sentence regardless that no individual error warranted reversal). With that in mind here, we find that we need not decide whether any of the individual errors found to have occurred in defendant's trial would amount to reversible error. Our obligation is to ensure that defendant had a fair trial and the

fact of the matter is that here the errors eliminated evidence (Kelly's testimony and Tankard's one statement) that would have buttressed defendant's claim of self-defense, and inappropriately denigrated what evidence in support of that claim (Dr. Trent's testimony) that defendant was able to marshal at trial. The thematic effect of those errors requires that they be evaluated cumulatively.

So viewed, the errors had a disproportionately harmful effect in defendant's trial than they would have, had each been examined individually. Defendant had only his justification defense on which to rely. His claim of self-defense hinged on his credibility, which was weakened at trial, and any other support he could bring to bear in support of the asserted justification. Based on the cumulative error that directly related to defendant's ability to present in full, and have fairly considered, the evidence to support his asserted justification of self-defense at the moment of the shooting, we conclude that the conviction for first-degree murder and the related conviction for possession of a weapon for an unlawful purpose must be reversed.

We hold that the errors' cumulative impact prejudiced the fairness of defendant's trial and, therefore, casts doubt on the propriety of the jury verdict that was the product of that trial. We reverse these convictions mindful that the State presented powerful evidence to undermine defendant's self-defense claim. *See supra* at note 10. That said, we must adhere to our constitutional obligation to ensure that defendant has received a fair trial in which his opportunity to defend himself is fully heard. *Blakney, supra,* 189 *N.J.* at 97, 912 *A.*2d 140; *Reddish, supra,* 181 *N.J.* at 616, 859 *A.*2d 1173. Guided by that measure, we have no choice but to reverse. Defendant is entitled to a new trial on the two charges.

## VI.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

Chief Justice RABNER, dissenting.

A jury convicted defendant George Jenewicz of first-degree murder, among other charges, for shooting his live-in girlfriend. Although defendant claimed that he acted in self-defense, evidence presented at trial suggested otherwise. Defendant fired a gunshot into the victim's chest. According to the forensic proofs, the shot was fired from a distance of two inches or less. After the shooting, defendant did not notify the police. Instead, he spackled over the bullet hole in the wall to cover it up. He also moved the body to the basement where he dismembered it. He placed the arms in a plastic bag and later disposed of them among tall weeds in a nearby field. He boiled the head in a pot in an effort to destroy all facial features. He wrapped the remainder of the body in plastic and placed it in a garbage can in the basement. One week after the shooting, defendant called a friend to ask for help in getting rid of what remained of the victim.

The majority decision properly recounts these facts. It also notes three trial errors but does not find that any one of them warranted reversal. I part company with the next step the majority takes: finding that the errors, viewed in the aggregate, require a new trial.

The State submits that if any errors were committed, they were harmless in light of the overall record. The harmless error standard requires that there be "some degree of possibility that [the errors] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the errors] led the jury to a verdict it otherwise might not have reached." *State v. R.B.*, 183 *N.J.* 308, 330, 873 *A.2d* 511 (2005) (quoting *State v. Bankston*, 63 *N.J.* 263, 273, 307 *A.2d* 65 (1973)). That determination must be made in the context of the entire record. *See State v. Marshall*, 123 *N.J.* 1, 200, 586 *A.2d* 85 (1991).

To the extent the standard governing constitutional errors applies, the relevant inquiry is whether the errors were harmless beyond a reasonable doubt. *State v. Castagna*, 187 *N.J.* 293, 312–13, 901 *A.2d* 363 (2006) (quoting *Chapman v. California*, 386 *U.S.*

18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705, 710 (1967)); *State v. Sanchez*, 129 *N.J.* 261, 278, 609 *A.*2d 400 (1992).

Defendant's gruesome conduct after the killings bears on his consciousness of guilt, *see State v. Williams*, 190 *N.J.* 114, 919 *A.*2d 90 (2007), and adds to the State's case. In light of that and other evidence, I do not believe that the three particular errors at trial, viewed singly or in the aggregate, "led the jury to a result it otherwise might not have reached." The errors were harmless beyond a reasonable doubt. As a result, I respectfully dissent.

Justice RIVERA–SOTO joins in this opinion.

*For reversal and remandment*—Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—5.

*For affirmance*—Chief Justice RABNER and Justice RIVERA–SOTO—2.